Submitted November 26, 2013, affirmed July 2, petition for review denied December 11, 2014 (356 Or 575)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LUIS ALBERTO SALAS-JUAREZ,
*Defendant-Appellant.*

Jackson County Circuit Court
063530FE; A149978

329 P3d 805

Peter Gartlan, Chief Defender, and Laura A. Frikert, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant challenges his convictions for murder and attempted murder, in violation of ORS 163.115 and ORS 161.405(2)(a). He assigns error to the trial court's failure to exclude testimony by the lead detective that defendant asserts was a comment on the credibility of another witness. Defendant did not object to the testimony when it was given, but he contends on appeal that he preserved the error with a pretrial motion that sought to prevent the state's witnesses from commenting on the credibility of other witnesses. He argues, alternatively, that if the error was not preserved, we should determine that the trial court's failure to strike the testimony *sua sponte* is plain error and should exercise our discretion to correct it. We conclude that the error was not preserved and, because it is plausible that defendant had a strategic purpose for not objecting, the trial court's failure to strike the testimony is not plain error. Defendant also assigns error to the trial court's ruling that disallowed the introduction of a treatise to impeach a detective's testimony. Defendant, however, did not preserve that error because he did not make an offer of proof. Finally, we decline to exercise our discretion to correct as plain error the trial court's failure to cure *sua sponte* the prosecutor's misstatement of the law during closing argument that defendant was no longer presumed innocent.[1] Accordingly, we affirm.

Defendant's original convictions were reversed and remanded for a new trial by the Supreme Court. *State v. Salas-Juarez*, 349 Or 419, 245 P3d 113 (2010). Defendant was retried and again convicted based on events that occurred early one morning, soon after the bars were closed in downtown Medford. While defendant was walking alone, Russell, whom defendant had never met, walked up to defendant. That chance encounter sparked events that resulted in the stabbing of Lunsford, who died in the hospital a couple of hours later, and the attempted stabbing of another victim.

The events were set in motion when, after leaving a bar, Russell ran into a group of eight to 10 people while walking home and some members of that group shouted out to him, "white power" and "white pride." Russell denied

---

[1] We reject defendant's remaining assignments of error without discussion.

being a racist, and someone in the group shouted out that Russell was a "nigger lover." Russell continued walking past the group and thereafter encountered defendant, a Hispanic man, who had also just left one of the downtown bars. Russell told defendant that there was a group of people nearby who were racists. Together, defendant and Russell went to confront the group and, upon meeting them, defendant took off his shirt and belt. Defendant started swinging the belt around and yelling obscenities.

Three witnesses—Lunsford's brother, Barnett, and Crowley, who was the victim of the attempted stabbing—testified that both Russell and defendant had knives and took them out during the fight, and that defendant stabbed Lunsford. Barnett stated that Russell was not near Lunsford during the stabbing. Crowley also testified that defendant attacked him with a knife and that he had to lunge away to avoid being stabbed. Russell, for his part, testified that he pulled his knife out to scare off some members of the group that came at him, and, that he had been hit on the back of the head early on in the fight, after which he dropped to the ground and was kicked in the side.

Defendant fled. A few minutes later, he waved down approaching police officers, who arrested and brought defendant to the police station. The police did not find Lunsford's blood on defendant's hands or clothes. Defendant did not have a knife and the police did not find a knife in the area where the fight occurred. Later in the investigation, police discovered that defendant had purchased a distinctive knife about two weeks before the stabbing and had carried it in a belted sheath every day, including the day before the early morning stabbing. After the police brought defendant to the police station, defendant talked to them but did not admit to stabbing Lunsford, though he did admit that he had gone with Russell to confront the victims and that he had taken off his belt and used it in the fight.

Shortly after the fight, Russell also ran and was initially not identified by anyone as a participant, as no one knew him. A few days later, the police determined that Russell was the person they were looking for and attempted to interview him. He declined to speak with them and

invoked his right to counsel. Later, represented by counsel, Russell came forward to give a statement to police about his participation in the fight and what he had witnessed. He disclosed that he had had a knife, which he had brandished during the fight, that someone had punched him in the head and knocked him down, that he had heard someone yell, "He's been stabbed," and that he had run away. Police officers executed a search warrant at Russell's home and found a t-shirt and shorts that looked like clothes that witnesses had described Russell wearing on the morning of the fight. They also found a black-handled folding knife. Lunsford's blood was not on those items.

At trial, defendant's counsel offered an alternative to the stated version of what happened. He insisted that the eyewitnesses who identified defendant as the stabber mixed up Russell with defendant and that their testimony was not consistent with the objective evidence. According to him, much of Russell's story was true, except that Russell stabbed Lunsford before getting knocked out of the fight when he was hit on the back of the head.

We first address defendant's assertion that the trial court erred when it failed to exclude testimony by the lead detective, Young, commenting on the credibility of another witness, Russell. On direct examination by the prosecutor, Young stated his thoughts about the statement that Russell gave to investigators:

"[PROSECUTOR]: From an investigative standpoint, what was the next thing that occurred during the proffer, that you felt was of interest to you, as a detective, a case agent?

"[YOUNG]: That the information I had [at] that point, from the witness statements, to what I knew of the scene, again, this is on August 22nd, *I did not find Mr. Russell's statement to be evasive or—and it appeared to fit with the circumstances, it appeared to be truthful, to me.*"

(Emphasis added.) Defendant contends that, under *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983), and *State v. Milbradt*, 305 Or 621, 629-30, 756 P2d 620 (1988), that statement on Russell's credibility was impermissible vouching.

As a preliminary matter, we address whether defendant's claim of error was preserved. To support his contention that he preserved the assigned error, defendant points to his pretrial motion that sought to "preclud[e] all State witnesses from offering an opinion about the credibility of the defendant or any other witness. *State v. Lupoli*, 348 Or 346, [234 P3d 117] (2010); *State v Keller*, 315 Or 273, 284-85, [844 P2d 195] (1993)." Defendant did not provide any further explanation in support of the motion, but the state offered possible context by noting that, in defendant's first trial, detectives had been cross-examined with accusations that they "had jumped to conclusions" and that their investigation was incomplete, and their credibility had been attacked. The court granted that motion.

However, that pretrial motion and order did not serve to preserve defendant's assignment of error. To preserve an argument for appeal, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Defendant does not explain how the pretrial motion—a generalized statement of the law (as we explain below) that applied to the trial regardless of whether the motion was granted—satisfied the requirements for preservation, particularly because, in this case, the trial was lengthy—about two weeks—and involved dozens of witnesses. Without an objection by defendant to specific testimony and an explanation for that objection, any error was not brought to the trial court's attention sufficiently so that it could be corrected. Therefore, any error was not preserved.

Nevertheless, conceding that he did not object or move to strike the vouching comment when it was made, defendant argues that under ORAP 5.45(1), the error is one "of law apparent on the face of the record."[2] In his view, the trial

---

[2] ORAP 5.45(1) provides, in part:

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *, provided that the appellate court may consider an error of law apparent on the record."

court was required, in light of Oregon case law that strongly proscribes a witness from commenting on the credibility of another witness, to exclude Young's testimony *sua sponte.*

An error is plain error if it (1) is legal error; (2) is "not reasonably in dispute"; and (3) appears on the record, meaning that "[w]e need not go outside the record or choose between competing inferences to find it[.]" *State v. Brown,* 310 Or 347, 355, 800 P2d 259 (1990). In Oregon, testimony commenting on the credibility of a witness is impermissible vouching and plain error. A witness is prohibited from "giv[ing] an opinion on whether he believes a witness is telling the truth." *Middleton,* 294 Or at 438; *see State v. Keller,* 315 Or 273, 285, 844 P2d 195 (1993) ("[A] witness may not testify about the credibility of another witness."). The Supreme Court amplified the importance of that rule when it stated, "We have said before, and we will say it again, but this time with emphasis—we really mean it * * *. The assessment of credibility is for the trier of fact[.]" *Milbradt,* 305 Or at 629. Application of the rule is "straightforward" when "one witness states directly that he or she believes another witness, or that the other witness is honest or truthful." *Lupoli,* 348 Or at 357; *see State v. Lowell,* 249 Or App 364, 366-68, 277 P3d 588, *rev den,* 352 Or 378 (2012) (admission of detective's testimony that he "didn't think that [the defendant] was being very honest" during his interview was plain error). "In light of *Milbradt,* this court has held that the trial court has a duty, *sua sponte,* to prevent testimony that is a comment on a witness's credibility." *State v. Higgins,* 258 Or App 177, 180, 308 P3d 352 (2013), *rev den,* 354 Or 700 (2014) (citing *State v. McQuisten,* 97 Or App 517, 520, 776 P2d 1304 (1989)).

The state argues that there is a reasonable dispute as to whether Young's comment—that Russell's statement "appeared to be truthful"—was vouching. That is so, it contends, because such a statement was not necessarily a comment on Russell's *credibility,* but rather was offered to show that Russell's statement fit with other evidence in the investigation. In other words, Russell's statement had an *effect* on Young that explained why he continued the investigation in

the way that he did.[3] Thus, according to the state, Young's testimony had "independent relevance." We are not persuaded. Young's comment that he found Russell's statement "truthful" and not "evasive" is a straightforward instance of vouching. That the comment related to his decision-making process for the investigation is of no consequence; investigators routinely make credibility determinations out of court, but that does not create an exception to the prohibition against relaying those credibility determinations in their in-court testimony.

The state also contends that the trial court's failure to strike Young's comment was not plain error because it is plausible that defendant's failure to object was a strategic choice. An error does not qualify as plain error if the record contains a competing inference that the party may have had a strategic purpose for not objecting. *State v. Gornick*, 340 Or 160, 169-70, 130 P3d 780 (2006). We have observed that such a competing inference for purposes of plain error review must be a plausible inference. *See State v. Lovern*, 234 Or App 502, 512, 228 P3d 688 (2010) ("the inference [of a strategic reason for not objecting] that the state posits is not plausible").

We conclude that it is plausible that defendant chose not to object to Young's comment because Russell's statement included assertions of fact that supported defendant's theory that Russell, not defendant, was the stabber. Indeed, defendant's counsel pointed out in his opening statement that Russell would testify consistently with defendant's statements and that his testimony would be believable:

"And when [Russell] takes the stand, he's a witness. * * * Russell is going to testify, and a lot of what he testifies, is—very believable. *And—and we're going—we're going to submit to you, that most, if not everything he says is right.* He probably didn't have a good memory of this incident,

---

[3] The state cites *State v. Odoms*, 313 Or 76, 829 P2d 690 (1992), and *State v. Nefstad*, 309 Or 523, 789 P2d 1326 (1990), for this argument. Both cases are inapposite. *Odoms* concerned "a relevant out-of-court statement," which, "recounted at trial, generally may not be excluded merely because it is phrased in the form of an opinion." 313 Or at 83. In *Nefstad*, a prosecutor cross-examined a witness to impeach him; the prosecutor's questions were "not even an indirect comment on defendant['s] * * * guilt." 309 Or at 556.

and he gives a good rendition of the facts, and he may not remember stabbing anybody. \* \* \* *But he—he is very consistent in other aspects of his—of his testimony, and—and I think largely believable, it's just the fact that the State has penned him in."*

(Emphases added.) In the follow-up to Young's vouching comment, the detective related, as anticipated by defendant, that many of Russell's statements matched what defendant had recounted:

"[PROSECUTOR]: Okay. Now, we have not seen [defendant's] statement to Detective Newell, but were many of the statements [defendant] gave to Detective Newell, regarding the events, corroborated by \* \* \* Russell?

"[YOUNG]: Yes.

"[PROSECUTOR]: Such as?

"[YOUNG]: Such as, they did not know each other, or had not met in any way, shape or form, prior to this. And I found that interesting, too, because as I said before, I believed we would have some relationship.

"[PROSECUTOR]: Okay. And does \* \* \* Russell specifically confirm [defendant's] statement about the other guy being knocked down?

"[YOUNG]: As far as him being knocked down? Yes.

"[PROSECUTOR]: As far as \* \* \* Russell being knocked down.

"[YOUNG]: Yes. Yes.

"[PROSECUTOR]: And he felt, by a belt or a punch?

"[YOUNG]: Yes.

"[PROSECUTOR]: Okay. Does he confirm [defendant's] statement regarding the other guy getting beat up pretty good?

"[YOUNG]: Yes.

"[PROSECUTOR]: Does he confirm [defendant's] statements regarding what clothing he was wearing?

"[YOUNG]: Yes.

"[PROSECUTOR]: And you confirmed that through the search warrant, right?

"[YOUNG]: Yes. The other thing about the proffer, that—that I found interesting, is—is Mr. Russell did not appear to basically, clean it up for himself. He admits that he had a knife, and had a knife out at that scene. He did not omit that fact.

"[PROSECUTOR]: Okay. And did he also tell you specifically, that he never saw a knife in [defendant's] hand?

"[YOUNG]: Yes."

Young's testimony—that Russell reported that he brandished a knife, was knocked down, and did not see defendant wield a knife—supports defendant's theory that Russell engaged with the victims and, though lacking an admission that Russell stabbed Lunsford, is consistent with the view that Russell committed the crime. We agree, therefore, that it is plausible that defendant may have refrained from objecting to Young's vouching testimony because Russell's statement, which Young found truthful, contained details about the stabbing that defendant himself asserted made Russell the more probable perpetrator. Under those circumstances, the trial court was not obligated to *sua sponte* exclude Young's credibility testimony, and its failure to do so therefore is not plain error.

We next turn to defendant's assertion that the trial court erred in preventing him from impeaching the testimony of one of the detectives with the introduction of a treatise about eyewitness investigation, as allowed by OEC 706. For the following reasons, we conclude that defendant did not adequately preserve any error.

Detective Harris-Powers testified about two eyewitnesses to the stabbing. Crowley, the victim of the attempted stabbing, told her that he had seen defendant fatally stab Lunsford and he identified defendant in a photo lineup. Barnett, who was among the victims, told her that defendant was the person who was closest to Lunsford during the fight and that defendant had stabbed Lunsford. Defendant's attempt to impeach Harris-Powers's testimony went as follows:

"[DEFENSE COUNSEL]: Same scenario, somebody comes in and steals my wallet, but this time points a gun

at everybody and leaves. You have heard of what we call weapon focus in your—in your line of work?

"[HARRIS-POWERS]: I do not think I have ever heard those terms specifically, no.

"[DEFENSE COUNSEL]: Okay. There have been studies on eyewitness testimony, and—and tell me if you are familiar with this, that when I have * * * interaction with you, it is one thing if I have an interaction with you and I do not carry a weapon. It is another, if I have got a knife or a gun in my hand, you are going to focus on that knife or that gun, correct?

"[HARRIS-POWERS]: I am not familiar with that study.

"[DEFENSE COUNSEL]: How long have you been a detective?

"[HARRIS-POWERS]: Eight years.

"[DEFENSE COUNSEL]: Okay. Sound right?

"[HARRIS-POWERS]: I[t] could happen. I have interviewed numerous people, and people over the years, and everybody seems to focus on different things for whatever reason.

"[DEFENSE COUNSEL]: Tell me if you think this sounds correct, * * * when a weapon is present, witnesses divert their attention away from the perpetrator to—

"[PROSECUTOR]: Objection, Your Honor * * *

"* * * * *

"[PROSECUTOR]: You can just ask her if she is familiar with that.

"[DEFENSE COUNSEL]: Sure, sure. I am holding * * * a book—* * * "Eyewitness Identification" and it is a lawyer's resource for expert testimony written by Roger Terry, PhD. Are you familiar with it?

"[HARRIS-POWERS]: I am not, no.

"[DEFENSE COUNSEL]: Okay. Let me read you a portion of it and let me tell you—

"[PROSECUTOR]: Objection, Your Honor, if she is not familiar with it, he cannot impeach her with that.

"THE COURT:    Sustained.

"[DEFENSE COUNSEL]:    Let me—let me ask you another question."

Thus, the trial court did not allow defendant to cross-examine Harris-Powers with the treatise because the detective said that she was unfamiliar with it. Defendant argues that that was error because OEC 706[4] allows for a treatise established as a reliable authority to be used for impeachment purposes, regardless of whether the witness is familiar with it. He relies on *State v. Morgan*, 251 Or App 99, 107, 284 P3d 496 (2012) ("OEC 706 does not require that the witness being cross-examined be personally familiar with a learned treatise if its reliability is established in another authorized way"),[5] for his contention that a witness need not be familiar with a treatise that is used for impeachment purposes. In *Morgan*, however, the defendant made an offer of proof. That is not the case here.

To preserve a challenge to the exclusion of evidence, "a party ordinarily must make an offer of proof as to the content of the excluded evidence." *State v. Olmstead*, 310 Or 455, 459-60, 800 P2d 277 (1990); *see* OEC 103(1)(b) (a party can assign error to a trial court's excluding of evidence if "the substance of the evidence was made known to the court

---

[4] OEC 706 provides:

"Upon cross-examination, an expert witness may be questioned concerning statements contained in a published treatise, periodical or pamphlet on a subject of history, medicine or other science or art if the treatise, periodical or pamphlet is established as a reliable authority. A treatise, periodical or pamphlet may be established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice. Statements contained in a treatise, periodical or pamphlet established as a reliable authority may be used for purposes of impeachment but may not be introduced as substantive evidence."

[5] We note that in *Morgan*, another witness established the treatise at issue as a reliable authority, as required by OEC 706 by testifying that it was an authoritative reference for police officers. 251 Or App at 107-08. In this case, the record does not show that defendant established the treatise as a reliable authority by one of the three methods set out by OEC 706: 1) testimony or admission by the witness; 2) other expert testimony; or 3) judicial notice. Harris-Powers was not familiar with the treatise and could not have established it as reliable. Defendant did not have an expert witness do so, and the trial court did not take judicial notice of its reliability. Regardless of whether defendant made an offer of proof as to the contents of his cross-examination for impeachment purposes, his failure to establish the reliability of the treatise is fatal to his claimed error.

by offer or was apparent from the context within which questions were asked"). If a party fails to provide an offer of proof, the error can be preserved "if '[t]he questions asked and the arguments presented to the court on the issue were adequate to inform the trial court of the substance of the evidence and its error in excluding it.'" *State v. Lasky*, 259 Or App 307, 315, 314 P3d 304 (2013) (quoting *Schacher v. Dunne*, 109 Or App 607, 610, 820 P2d 865 (1991), *rev den*, 313 Or 74 (1992)).

"The purpose of this rule is to assure that the appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case." *State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988). Another purpose for the rule is to "assure that the trial court can make an informed decision" because "[a]n offer of proof permits the parties to raise additional arguments, if appropriate, and gives the court an opportunity to reconsider its ruling and correct any error." *Olmstead*, 310 Or at 461. We do not require an offer of proof if such an offer was "impossible because of a trial court's refusal to allow the offer of proof to be made." *Affeld*, 307 Or at 129.

Here, defendant did not make an offer of proof that would allow us to properly evaluate whether the treatise could be used to impeach Harris-Powers. The record shows that defendant desired to introduce a treatise that opined about the unreliability of eyewitness testimony—specifically, a theory about so-called "weapon focus"—to call into question the accuracy of Crowley's and Barnett's eyewitness accounts. What is not clear, however, is what excerpts from the excluded treatise defense counsel would have used as a basis for his questions to Harris-Powers and what questions, based on those excerpts, he would have asked. To be sure, OEC 706 liberally allows for the introduction of a learned treatise,[6] but "for purposes of impeachment[,] * * *

---

[6] Defendant brings to our attention Professor Laird Kirkpatrick's comments on OEC 706:

"The writing may be used only for impeachment. Nonetheless, the rule serves an important purpose. It allows a party seeking to impeach an expert with a learned treatise to more easily establish that the treatise is a 'reliable authority.' Rather than being dependent on the testifying expert to acknowledge

not * * * as substantive evidence." In this case, we are unable to determine, because of defendant's failure to provide an offer of proof or from the context of the attempt to introduce the treatise, how he would have used it to challenge Harris-Powers's testimony, as opposed to using it as substantive evidence to question the reliability of the investigation's eye-witness accounts. We therefore conclude that the asserted error was not preserved.

Lastly, we turn to defendant's challenge to the trial court's failure to, *sua sponte*, take "immediate, corrective action" when the prosecutor stated—without objection by defendant—during closing argument that "[a]s [defendant] sits there, now, he is guilty. Presumption of innocence was at the beginning." The prosecutor misstated the law, but, as in *State v. Sanchez-Jacobo*, 250 Or App 621, 282 P3d 880 (2012), *rev den*, 353 Or 280 (2013), and for similar reasons, we decline to exercise our discretion to correct the error.

Affirmed.

---

that the treatise is a reliable authority, the cross examiner can establish its authoritativeness by other means, such as the testimony of other experts (*e.g.*, the party's own expert) or by requesting the court to take judicial notice."
Laird C. Kirkpatrick, *Oregon Evidence* § 706.03, 643-44 (5th ed 2007).