Submitted November 26, 2013, affirmed March 11, petition for review denied September 11, 2015 (357 Or 743)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CRAIG ALAN SWINNEY,
*Defendant-Appellant.*

Josephine County Circuit Court
10CR0269; A150015

345 P3d 509

Peter Gartlan, Chief Defender, and Mary M. Reese, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Ryan Kahn, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant appeals a judgment of conviction for six counts of first-degree sexual abuse, ORS 163.427; one count of first-degree unlawful sexual penetration, ORS 163.411; one count of first-degree sodomy, ORS 163.405; one count of second-degree unlawful sexual penetration, ORS 163.408; one count of second-degree sodomy, ORS 163.395; and one count of first-degree rape, ORS 163.375. Defendant challenges the trial court's admission of a police detective's expert testimony regarding grooming behavior generally and his opinion that defendant's behavior as described by the victim was consistent with grooming behavior. We write to address defendant's arguments that the detective's testimony is not relevant under OEC 401, that it did not assist the trier of fact because the detective was not sufficiently qualified as an expert under OEC 702, and that the trial court should have excluded the grooming evidence *sua sponte* because it constituted an indirect comment on the victim's credibility.[1] We conclude that the grooming evidence was relevant, that the detective was sufficiently qualified as an expert to testify as he did, and that the testimony did not constitute a comment on the victim's credibility. Accordingly, we affirm.

The following trial evidence is pertinent to our review. Defendant met the victim when she was about six years old and living in Sacramento, California. The victim's mother had multiple sclerosis that affected her vision and physical mobility, making it difficult for her to perform housework. In order to pool financial resources and to help the victim's mother with housework, defendant, his wife, and his two children moved in with the victim and her mother. When the victim was about seven, defendant's wife and two children moved out of the house and defendant began a romantic relationship with the victim's mother. The victim testified that she viewed defendant as her father. Around the same time, he began tucking her in at night. As he did so, he would kiss her on the lips and say goodnight. Those kisses progressed from "a peck" to kisses that were "more involved, * * * [l]ike a girlfriend kisses her boyfriend." When

---

[1] We reject defendant's other arguments without published discussion.

the victim was about eight-and-a-half, defendant began kissing her with his tongue. At first, the victim felt "awkward" about the kisses, but after a time, she thought the kisses were normal, and they made her feel like defendant loved her.

When the victim was almost 10, the family moved to Oregon and began living at a campground in Cave Junction. The victim stayed in a tent separate from her mother and defendant, but she testified that defendant continued to kiss her at night, progressively kissing her for longer periods of time. As he would kiss her, defendant began to hug her and rub his hands on her chest over her clothes. The victim described learning to kiss defendant back and feeling loved and cared for, particularly because she was a "bigger kid" who had been made fun of for being fat and the kissing made her feel like someone thought she was pretty. Defendant had been the only protective male figure in her life. While living at the campground, defendant and the victim would swim in a nearby river; defendant would often throw the victim while they were in the water and would touch her bottom and vagina, briefly rubbing her vagina right before he released her.

After living at the campground for a few months, the family moved into a trailer on a nearby ranch. By that time, the victim's mother's health had declined; she was almost blind, and she took sleeping pills and smoked marijuana, which meant that she slept heavily at night. The victim testified that defendant continued to kiss her at night and began touching her over her clothes on her breasts, stomach, hips, thighs, and vagina, and would rub on the top of her vagina. She described feeling "weird" about that at first, but then becoming accustomed to it and liking it. She testified that, after a few months of that, defendant began touching her vagina underneath her underwear and touching the rest of her body underneath her clothes. Around this time, defendant also began slightly penetrating her vagina with his finger.

When the victim was 11 years old, the family moved into an apartment. The victim testified that the sexual abuse continued to escalate and defendant began more

deeply penetrating her vagina with his finger. Defendant began putting his mouth all over the victim's body, including her vaginal and anal areas. She testified that, like with the other sexual abuse, that transition occurred progressively. After she turned 12, defendant began rubbing his penis on her vagina, first on the outside of her clothes.

The victim testified that one night when she was 13, defendant came into her room, straddled her, and began kissing her as he had before. He then partially penetrated the victim with his penis. The victim began crying and told him to stop. Defendant got up, left the room, came back and changed the victim's sheets, and told her that if she told anyone about what had happened, they would both get into trouble. The next day, the victim ran away from home. About four years later, when she was 17, she disclosed the abuse to a counselor. The charges in this case followed.

As part of the police investigation into the sexual abuse, Detective Harrison interviewed the victim. At trial, he described what the victim had told him about the years of progressively more intrusive sexual abuse. The prosecutor established Harrison's qualifications as an expert in dealing with child victims of sexual abuse. The prosecutor then asked Harrison, based on his training and experience, what the word "grooming" meant in this context. Harrison testified:

> "Grooming is a process that is often seen in familial sexual abuse investigations * * * and it's a protective process that an adult will take with a child. Children are often more inclined to disclose and be frightened by sudden and aggressive behavior. Most of familial sexual abuse cases involve extensive time and trust, a building of trust, a building of appropriateness even though it is inappropriate in all of our eyes instantly, the child is unable to, and * * * unaware of what is actually occurring. The behaviors that [the victim] described that were perpetrated by [defendant] were classic elements of grooming; creating trust, being the one that is sharing something special, not being physically aggressive or harmful, not creating pain, not creating fear, but creating acceptance and understanding."

Harrison then described his interview with the victim and testified how the victim had described the "progressive"

nature of the abuse, in that defendant began with less intrusive touching and, over the course of many episodes of abuse, moved to more intrusive touching. The prosecutor asked Harrison if that type of progression was "parallel with grooming." Harrison responded that "[i]t is by its mere definition grooming."

Harrison further testified that an offender often warns a child that the child could get into trouble if people became aware of the sexual contact. He also stated that offenders often choose children who are vulnerable and lack consistent or stable parents, particularly children who have not had "a male influence in their home extensively." Harrison described how he had communicated to defendant that a similar pattern seemed to be present here: defendant had left a healthy wife and children for a woman whose health was rapidly deteriorating, who was blind and could not see the abuse, and whose heavy use of medication meant that she was not involved as a parent. Additionally, the victim was an emotionally fragile child who had never had a father figure in her life.

Defendant argues that the court erred in admitting, as expert testimony, Harrison's testimony that child abusers engage in two types of grooming behavior: (1) they use certain techniques to get close to a child and desensitize the child to sexual activity, and (2) they exploit a child's personal characteristics and environmental circumstances when selecting a child for abuse. Defendant further argues that it was error to admit Harrison's testimony that defendant engaged in both types of behavior in this case. Defendant contends that the testimony failed to meet the conditions for admission of expert testimony because (1) it was not relevant under OEC 401, (2) it did not assist the trier of fact under OEC 702 because Harrison was not sufficiently qualified as an expert, and (3) under OEC 403, the danger of unfair prejudice in admitting Harrison's testimony outweighed its probative value because that testimony improperly commented on the victim's credibility.

On the relevance question, defendant argues that the grooming evidence is inadmissible under *State v. Hansen*, 304 Or 169, 743 P2d 157 (1987). Defendant contends that

the only reason for the state offering "evidence that defendant engaged in behaviors typical of a child sexual abuser was to inferentially establish that defendant was a child sexual abuser and, therefore, that he sexually abused [the victim]"—"the very chain of inferences that *Hansen* held is not logically relevant." The state counters that the grooming evidence in *Hansen* was offered for a different purpose than the state's purpose in this case, which was to help the jury understand and evaluate the testimony about defendant's overarching plan to choose, desensitize, and abuse the victim, while tending to corroborate the victim's account of the abuse. Further, the state argues that defendant is applying *Hansen*'s secondary ruling, an OEC 403 argument, even though defendant preserved only an OEC 401 relevancy argument. Even if defendant had preserved the argument, an OEC 403 analysis is a "highly fact-specific inquiry," the state contends, and the court in *Hansen* did not purport to create a rule that would prohibit the state from using such testimony about grooming to explain a defendant's plan to abuse the victim; such testimony is not substantively different from other specialized testimony that police officers regularly give about typical methods for committing certain crimes.

In *Hansen*, the state offered testimony that grooming—including specific acts such as gift-giving and offering affection and praise—had created an emotional dependence that explained the victim's initial denial of the abuse by the defendant. 304 Or at 174. The Supreme Court concluded that the trial court had erred in admitting that evidence because the specific techniques that some child abusers use to get close to victims, which may result in the child's emotional dependence on the abuser, "are irrelevant to the effect the dependence has on the child's willingness to implicate the abuser." *Id.* at 176 ("It is the emotional dependence, not the specific acts that produce it, that helps to explain the child's behavior."). The court then analyzed "the only other possible ground" that the evidence would be offered, as evidence that the defendant had sexual relations with the victim. The court determined that the relevance for that purpose was "practically nil," because the fact "[t]hat child abusers use these techniques has no bearing on whether a person who

does these things is a child abuser."[2] *Id.* Further, the court made a secondary ruling that under OEC 403, in light of the "lack of probative value" in the testimony, "the danger of unfair prejudice to [the] defendant from the unwarranted inference that, because [the] defendant engaged in acts that sexual child abusers engage in, she too, is a sexual child abuser is simply too great." *Id.*

We review trial court determinations of relevance for legal error. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). Evidence is relevant if it has "any tendency" to make the existence of a material fact more or less probable than it would be without the evidence. OEC 401. The relevance of evidence "depends on the particular facts of each case." *State v. Stafford*, 157 Or App 445, 454, 972 P2d 47 (1998). "The threshold for relevance is low." *State v. Lewis*, 352 Or 626, 635, 290 P3d 288 (2012).

Under that standard, we readily conclude that the evidence at issue here is relevant. First, the grooming evidence in this case is factually distinct from *Hansen*. The victim's testimony described a progression of sexual abuse that involved defendant slowly introducing, and making the victim comfortable with, increasingly intrusive touching over time. Harrison's testimony about grooming was relevant because it helped the jury to understand the victim's testimony in the context of how familial sex abuse typically presents. The "specific acts" of grooming that Harrison described as typical were the very kind of acts that formed the basis of the charges against defendant, and thus his testimony was

---

[2] As we discuss below, *Hansen* is distinguishable on its facts. However, we pause to note the Supreme Court's assertion that acts such as gift-giving, affection, and praise that an abuser uses to encourage emotional dependence in a child victim are not relevant either to show why the child victim initially denied the abuse or to show that the abuse occurred bears reexamination. Since the court issued that decision in 1987, the body of research establishing that perpetrators use such behaviors for exactly those purposes has greatly expanded and calls into serious question the Supreme Court's statements that such evidence is irrelevant and has probative value that is "practically nil." *See, e.g.,* Karen J. Terry and Jennifer Tallon, *Child Sexual Abuse: A Review of the Literature* 22 (2004); U.S. Department of Justice, *The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress* 21 (August 2010); Kenneth V. Lanning, *Child Molesters: A Behavioral Analysis*, National Center for Missing and Exploited Children 26 (2010), www.missingkids.com/publications/NC70 (last accessed Feb. 12, 2015).

relevant for understanding a central issue in the case. *See Stafford*, 157 Or App at 454 (distinguishing *Hansen* on the basis that "the evidence in this case about grooming is the gravamen of the charges against defendant").

Further, the testimony about grooming that concerned how offenders often choose vulnerable children was relevant to understanding defendant's plan to abuse the victim, which is admissible under *State v. Leach*, 169 Or App 530, 537, 9 P3d 755 (2000) (concluding that evidence of grooming was relevant to "plan" or "preparation" and should not be excluded under OEC 403 balancing). Unlike in *Hansen*, we conclude that the relevance is much more than "practically nil." 304 Or at 176. Contrary to defendant's argument, Harrison's testimony concerning grooming did not require the jury to follow a chain of inferences or to take any logical leaps; if believed, his testimony served to illuminate the significance of specific acts that the victim described that formed the basis for the charges against defendant.

We next address defendant's contention that Harrison was not qualified to testify that defendant groomed the victim. Defendant concedes that, under OEC 702, Harrison may have been qualified to testify as an expert on the specific tactics and techniques that a child abuser uses to select a child and to desensitize that child to sexual abuse. However, defendant argues that Harrison was not sufficiently qualified to testify that, when defendant acted in a particular way, he was employing the selection tactics and grooming techniques of a sex abuser. Defendant contends that, for Harrison to testify on the latter issue, he was required to have expertise in psychology, behavioral science, or, at the very least, to have personally evaluated defendant. The state counters that Harrison's testimony was offered for two purposes: (1) to provide general background on grooming (a purpose for which defendant concedes that Harrison's qualifications were sufficient), and (2) to provide factual context for Harrison's interview with defendant in order to illuminate defendant's responses. Accordingly, the state contends that it was not required to lay any further foundation for the admission of the testimony.

We review for legal error whether the trial court properly applied OEC 702 to determine that an expert was qualified to give testimony about a particular topic. *State v. Rogers*, 330 Or 282, 310, 4 P3d 1261 (2000). We begin by noting that, here, defendant has not challenged Harrison's qualifications to give general testimony regarding grooming and that any argument that Harrison's testimony was scientific and lacked a scientific foundation was unpreserved; defendant's trial objections addressed only a general "lack of foundation." Accordingly, we will not delve into the unsettled issue of the scientific foundation for grooming evidence and address only whether Harrison's expert testimony met the requirements of OEC 702.[3]

Under that rule, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." An expert must have "the necessary skill and knowledge to arrive at an intelligent conclusion about the subject matter in dispute." *Burton v. Rogue Valley Medical Center*, 122 Or App 22, 26, 856 P2d 639, *rev den*, 318 Or 24 (1993). OEC 702's requirement that testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" serves multiple functions, such as:

> "'(1) supplying general propositions which will permit inferences from data which the trier of fact would otherwise be forced to find meaningless; * * * and (4) adding specialized confirmation and thus, confidence to general propositions otherwise likely to be assumed more tentatively by the trier.'"

*State v. O'Key*, 321 Or 285, 298, 899 P2d 663 (1995) (quoting John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev 349, 360 (1992)). Testimony must be relevant under OEC 401, helpful to a

---

[3] "The foundational requirements for grooming evidence are a hotly contested issue." *State v. Borch*, 230 Or App 619, 635 n 10, 216 P3d 915 (2009) (internal quotation marks omitted). We have previously been divided on what, if any, scientific foundation needs to be laid for grooming evidence. *Stafford*, 157 Or App at 454-59, 460-79.

trier of fact under OEC 702, and must pass the OEC 403 balancing test. *O'Key*, 321 Or at 298-99.

We have concluded above that the testimony is relevant. The issue, then, is whether Harrison's testimony was helpful to the trier of fact. Defendant does not challenge Harrison's qualifications as an expert to generally discuss grooming in the context of familial sexual abuse, and his contention that applying those general principles to the evidence in this case required education and training beyond what qualified him to testify about grooming generally is not well taken. Harrison was qualified to offer an opinion so long as it assisted the jury in understanding the evidence, and his qualifications regarding grooming generally qualified him to draw an "intelligent conclusion," *Burton*, 122 Or App at 26, that "[t]he behaviors that [the victim] described that were perpetrated by [defendant] were classic elements of grooming." Similarly, Harrison reached an "intelligent conclusion," *id.*, that the type of abusive progression that victim described was "by its mere definition grooming."

Moreover, we do not accept the premise of defendant's argument—that Harrison testified that defendant acted in a particular way. Harrison testified that the events described by the victim constituted grooming, not that defendant groomed the victim. Harrison's other testimony about grooming concerned how offenders target particularly vulnerable children and that those children often lack capable or protective parents. He further testified that he confronted defendant with the similarities between a typical grooming pattern and the pattern that was present in defendant's relationship with the victim and her mother. He did not, however, draw a conclusion for the jury about defendant's behavior. Because Harrison was sufficiently qualified as an expert for the opinion he gave, the trial court did not err in admitting his testimony as an expert witness.

Finally, we address defendant's argument that Harrison's testimony about grooming was an indirect comment on the victim's credibility as a witness and therefore constituted impermissible vouching and must be excluded under OEC 403. Defendant concedes that he did not preserve that argument, but requests that we review it as error

apparent on the face of the record. ORAP 5.45(1). He argues that this case presents an error of law that is not subject to dispute and that the facts constituting the error—the substance of Harrison's testimony—appear in the transcript and are "irrefutable." Defendant thus contends that the trial court's error was plain. The state responds that defendant's claim does not qualify for plain error review because Harrison did not actually comment on the victim's credibility, directly or indirectly; rather, he only described statements that the victim made and analyzed how the events described by the victim, if true, fit within the concept of grooming.

"An error is plain error if it: (1) is legal error, (2) is 'not reasonably in dispute'; and (3) appears on the record, meaning that '[w]e need not go outside the record or choose between competing inferences to find it[.]'" *State v. Salas-Juarez*, 264 Or App 57, 63, 329 P3d 805 (2014) (quoting *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990)). "In Oregon, testimony commenting on the credibility of a witness is impermissible vouching and plain error." *Salas-Juarez*, 264 Or App at 63. "[T]he trial court has a duty, *sua sponte*, to prevent testimony that is a comment on a witness's credibility." *State v. Higgins*, 258 Or App 177, 180, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014).

"[I]n Oregon, a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). The jury, the trier of fact, is solely responsible for assessing the credibility of a witness. *State v. Milbradt*, 305 Or 621, 629-30, 756 P2d 620 (1988). Accordingly, an expert witness may not present testimony that relies on the expert's assessment of a victim's credibility, because a jury may defer to the expert's testimony and fail to independently assess a witness's credibility. *State v. McCarthy*, 251 Or App 231, 236-38, 283 P3d 391 (2012); *see also State v. Southard*, 347 Or 127, 142, 218 P3d 104 (2009) ("[A] statement from an expert that, in the expert's opinion, the child was sexually abused" is not admissible under OEC 403 where "that diagnosis does not tell the jury anything that it could not have determined on its own."); *State v. Cox*, 248 Or App 325, 333, 273 P3d 299 (2012) (determining that an

expert's sex abuse diagnosis presented a substantial risk that the jury was prejudiced in evaluating the child victim's credibility).

However, "if a witness is accepted as an expert by the trial court, it is not error to allow testimony describing the reaction of the typical child victim of familial sexual abuse." *Middleton*, 294 Or at 438. Further, there is a distinction between impermissible vouching and corroboration, or the state providing evidence that "could assist the jury in making its own assessment of the meaning of [the victim's] statements and, by extension, her credibility." *State v. Sundberg*, 268 Or App 577, 585, 342 P3d 1090 (2015) (determining that a doctor's testimony that 10-year-old girls, like the victim, typically describe their anatomy in a certain way was not a statement on the victim's credibility, but rather an explanation that may account for why the victim described her anatomy in a certain way). "The jury's function is not impinged upon when expert testimony does no more than provide jurors with useful, nonconclusive information from which *inferences* as to credibility *may* be drawn." *State v. Remme*, 173 Or App 546, 562, 23 P3d 374 (2001) (emphasis in original) (concluding that a social worker's testimony was admissible to describe the reaction of a typical child victim of familial sex abuse, both as a general testimony and as to whether the particular victim's conduct was consistent with the general phenomenon).

Here, there was no legal error because Harrison's testimony did not rely on an assessment of the victim's credibility. Harrison objectively described characteristics typical of grooming in family sex abuse cases, and then applied his knowledge to the case at hand, stating, "The behaviors that [the victim] described that were perpetrated by [defendant] were classic elements of grooming." Harrison then repeated common characteristics of familial grooming. Harrison thus couched his conclusions in terms of what the victim described, providing the jury with context for evaluating her testimony, but did not comment on her credibility. Further, his one conclusion—that the progression of abuse that the victim described was "by its mere definition grooming"—was also framed around the victim's description of the abuse, not on his assessment of whether he believed that description.

That testimony did not constitute impermissible vouching and its admission did not constitute plain error.

Affirmed.