Argued and submitted September 30, 2013, affirmed March 18, 2015

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**IVERY LEE MAYS, JR.,**
*Defendant-Appellant.*

Multnomah County Circuit Court
100431422; A148766

346 P3d 535

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Timothy A. Sylwester, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

HASELTON, C. J.

_____

* Haselton, C. J., *vice* Wollheim, S. J.

## HASELTON, C. J.

Defendant appeals a judgment of conviction for delivery of marijuana for consideration, ORS 475.860 (2009) (Count 1), and possession of marijuana, ORS 475.864 (2009) (Count 2).[1] Of the nine assignments of error that he raises on appeal, we write to address only defendant's contentions that the trial court erred in denying his motion to dismiss on double jeopardy grounds under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution and on the ground that prosecutorial misconduct violated his constitutional right to compulsory process under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. We reject defendant's remaining contentions without written discussion.[2] As amplified below, we conclude that the trial court did not err in denying defendant's motion to dismiss. Accordingly, we affirm.

## I.  STANDARD OF REVIEW

We review a trial court's ruling on a motion to dismiss for errors of law, *State v. Garner*, 234 Or App 486, 491, 228 P3d 710, *rev den*, 348 Or 621 (2010), and are bound by the trial court's findings of historical fact that are supported by evidence in the record, *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). If the trial court did not make express findings, we resolve disputed facts consistently with the trial

---

[1] The conduct at issue in this case occurred in 2010. Both ORS 475.860 and ORS 475.864 have been amended since then. Or Laws 2011, ch 597, § 88 (amending ORS 475.860); Or Laws 2011, ch 597, § 89 (amending ORS 475.864); Or Laws 2013, ch 591, § 2 (same). Further, we note that both statutes have been amended by Ballot Measure 91 (2014), a voter initiative approved at the November 4, 2014, general election. Those amendments became effective on December 4, 2014, but are not operative until July 1, 2015. Accordingly, for clarity, our references to ORS 475.860 and ORS 475.864 are to the 2009 version that was in effect at the time of the conduct in this case.

[2] Those contentions pertain to the denial of defendant's pretrial motion to dismiss on compulsory process grounds, the denial of his motion to compel disclosure of the identity of the state's confidential informant, the denial of his motion to compel disclosure of the consideration given to that informant, the denial of his motion to suppress evidence obtained during the warranted search of his residence, the denial of his supplemental motion to suppress a particular item of evidence found during the search, the denial of his motion to exclude expert testimony related to that item of evidence, and the trial court's failure to merge defendant's guilty verdicts.

court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

## II. UNDERLYING FACTS AND PROCEDURAL HISTORY

Defendant's first trial for possession and delivery of marijuana ended in a mistrial. He was then retried and convicted of both offenses. The gravamen of defendant's post-mistrial motion to dismiss is his contention that prosecutorial misconduct deprived him of the favorable testimony of one of his witnesses, Oren Maney. For that reason, we begin with a detailed description of the prosecution's pretrial interactions with Maney before turning to a description of the prosecutor's conduct during defendant's first trial and the events that occurred following the mistrial.

On April 8, 2010, Portland police officers executed a warrant authorizing a search of defendant's residence. During that search, the officers found "[m]arijuana; drug packaging materials; a digital weighing scale; drug ledger; U.S. currency, money; and firearms." Some of that evidence, including the marijuana, was found in a locked room in defendant's basement. Defendant was indicted for possession and delivery of marijuana. ORS 475.864 (possession); ORS 475.860 (delivery).[3]

### A. *Pretrial Prosecutorial Conduct*

Before defendant's first trial was scheduled to begin, Multnomah County Deputy District Attorney Allison

_____

[3] Shortly before defendant's first trial was scheduled to begin, the state dismissed the original indictment and reindicted defendant for possession of marijuana, ORS 475.864, and delivery of marijuana as a commercial drug offense, ORS 475.860; ORS 475.900(1)(b). As we explained in *State v. Huff*, 253 Or App 480, 485 n 4, 291 P3d 751 (2012), "ORS 475.900(1)(b) provides that the crime of possession, delivery, or manufacture of a controlled substance is a commercial drug offense—resulting in a higher crime seriousness classification under the sentencing guidelines—if it is accompanied by at least three of several factors enumerated in the statute." Here, the indictment charged that the offense was a commercial drug offense because defendant possessed $300 or more in cash, ORS 475.900(1)(b)(B); a firearm for the purpose of using it in connection with a controlled substance offense, ORS 475.900(1)(b)(C); materials being used for the packaging of controlled substances, ORS 475.900(1)(b)(D); and drug transaction records or customer lists, ORS 475.900(1)(b)(E). Our understanding is that the state's handling of the reindictment resulted in the issuance of a second arrest warrant, defendant's rearrest, and the postponement of his first trial.

Williams, who had been assigned to prosecute defendant's case, provided defendant's witness list to Portland Police Officer Travis Law, the lead investigating officer who had executed the affidavit in support of the warrant to search defendant's residence. Law was also a member of the Metro Gang Task Force and, for that reason, was "cross-designated as [a] federal agent[.]"

Oren Maney's name appeared on that witness list. According to Law, Maney did not "appear to have any connection with * * * defendant." Law also learned that Maney had a "marijuana card" through the Oregon Medical Marijuana Program.

After consulting with Williams, Law met with Maney. Law showed his federal identification to Maney, and federal Special Agent Burke, with whom Law was conducting surveillance in an unrelated matter, accompanied Law to the meeting.

According to Law, Maney made the following statements: (1) Maney had met defendant through his mother, Kimberly Maney (Kimberly). (2) Maney had lived with defendant for a time and had a key to the locked room in defendant's basement. (3) The marijuana found in the locked room (as well as other items found during the search of defendant's residence) belonged to Maney and were left behind when he moved out. (4) Maney had a "medical marijuana card."[4]

Because Maney's statement "seemed rehearsed," Law said, "Look, you know, I don't know how you became involved in this investigation, but, you know, you have to understand that if you intend on coming to court and perjuring yourself that you could potentially be arrested." (Internal quotation marks omitted.) In addition, Burke told Maney that it is a crime to lie to a federal agent. At that point, Maney became agitated, and Law asked him to leave.

After that meeting, defense investigator Frederick Gove met with Maney. Maney told Gove that Law and Burke had told him that he was lying and threatened

---

[4] Our understanding is that Maney was a provider who was authorized to grow marijuana for medical marijuana patients.

him by indicating that he would go to jail if he testified. Nevertheless, at that point, Gove believed that Maney would testify on defendant's behalf.

Also after Law's meeting with Maney, Williams contacted Maney's mother, Kimberly, a probation officer with the Multnomah County Juvenile Department. Kimberly told Williams that Maney was not involved in the case but planned on testifying.

Shortly thereafter, Williams and Gary Boek, an investigator with the district attorney's office, met with Kimberly at her office. During their conversation, Kimberly indicated that defendant—who was a juvenile counselor with the Clackamas County Juvenile Department—had contracted to work with her office as a group facilitator several years earlier but that she had not introduced defendant and Maney. She further indicated that Maney had been living with her before moving into his current residence. Finally, Kimberly stated that, before Williams had contacted her, she had had a conversation with Maney about his involvement in this case and that Maney had told her that he was not involved and that the marijuana was not his. According to Kimberly, "as a mother and also as a probation officer," she told Maney "not to get involved in something that he wasn't involved in."[5]

At some point, Williams discussed this case with her supervisor, Mark McDonnell, who, in turn, discussed it with others in the office, including the chief deputy. Williams testified that "the thing that was unusual about this case was that we had very strong evidence that we had a witness that was coming in that intended to perjure himself in trial." According to Williams, they "couldn't find a clear link between [Maney] and the defendant." She further noted that it had been observed that "the only link" that they could find between Maney and defendant was that defendant's current defense attorney, Barry Engle, had "represented both of them in a drug case."

---

[5] Kimberly testified that she did not feel threatened during those interactions and did not feel that her job had been threatened. Further, Kimberly stated that she was never asked to speak with her son and tell him not to come to court.

As a result of those discussions, Williams, accompanied by Boek (the investigator from the prosecutor's office), met with Maney at his residence. While standing outside the front door, Boek told Maney that they had met with his mother and "were there to hear what he had to say and understood that he may want * * * to change what he had initially said about whose marijuana it was." Maney indicated that he had already spoken with Law and Burke and that "they started intimidating him and threatening him and he didn't trust what the officers were telling him" but reiterated that he had lived with defendant for several months and that the marijuana was his. Williams told Maney that, if he came to court and lied, he could be arrested for a crime but that, if he told the truth, he could not be arrested.[6] When Boek asked Maney to explain why his fingerprints were not found on any of the items seized from the locked room and about inconsistencies between Maney's assertions and his mother's statements, Maney became "agitated" to the point that Williams described his behavior as "threatening" and "scary." Ultimately, Maney's girlfriend "put an arm" between Maney and Williams and Boek. As Boek and Williams were leaving, Boek told Maney that he "thought maybe [Maney's] marijuana was causing him to be a little delusional and he needed help[.]"

Defense investigator Gove contacted Maney again after his meeting with Williams and Boek. According to Gove, Maney indicated that he "was not going to participate in the case anymore" and had "been receiving threats from the district attorney" and felt that "there was a lot of harassment from the police and from the district attorney about him being a witness." Gove thought that Maney "was also quite concerned about his mother's job security at this point."

B. *Prosecutorial Conduct During Defendant's First Trial*

Against that historic backdrop and before his first trial began, defendant moved to dismiss the charges against

---

[6] Williams and her supervisors had discussed what would be appropriate for her to say if the issue of arrest arose during her discussion with Maney. According to Williams, they decided that "just sticking to the statement that [she] ultimately did make was factually accurate" and they "did not believe [that] it would constitute witness tampering" but that it "would be the best way to deal with that issue were it to come up."

him based on the prosecution's interactions with Maney and his mother. Defendant contended that those interactions violated, *inter alia*, his constitutional rights to compulsory process and due process.[7] The trial court denied that pretrial motion, stating that, after hearing the evidence, it was "not convinced that the government conduct in this case is outrageous in violation of due process."

Following the trial court's denial of that motion and the court's resolution of a myriad of other pretrial motions, defendant's first trial began. Throughout trial, the court granted several defense motions and sustained a variety of defense objections and, on several occasions, ordered remedies in lieu of a mistrial. For purposes of our analysis, it is sufficient to describe three salient examples of Williams's conduct that precipitated a defense objection or motion.

First, Williams attempted to elicit testimony from Kimberly that Maney had intended to testify falsely:

"Is it your understanding that at one point your son planned to testify for the defense in this trial?

"MR. ENGLE:   Objection. Just another form of hearsay.

"THE COURT:   Overruled.

"[KIMBERLY]:   Yes, it is my understanding.

"* * * * *

"[MS. WILLIAMS]:   Is it your understanding that this testimony would have been untrue?

"MR. ENGLE:   Objection."

Following a colloquy outside the presence of the jury, the court sustained defendant's objection, stating that it would instruct the jury to disregard the question.

When the court asked counsel whether there was anything further that should be addressed outside the jury's presence, Engle said:

---

[7] Defense counsel, Engle, had subpoenaed Maney, but, when Engle had spoken with him, he learned that Maney was not willing to come to court. Engle took no other action to enforce the subpoena, explaining that "[i]t's not viable for me to drag him in via arrest" and that it "would possibly be *** borderline ineffective counsel for me to drag some witness in not knowing what he's going to say."

"[T]his inclination of Ms. Williams to ask objectionable questions and to admit objectionable evidence to get it [in] front of the jury and then either withdraw it or—or, you know, have it removed is becoming quite a pattern, which is greatly—I think should be greatly concerning to the—the veracity of the—of the Court, of the jury proceeding—the reliability of the jury proceedings.

"*** [I]f she's got plans to introduce something that we've been talking about previously that the Court has ruled on, you know, it would seem to be in the best interest of everybody if she'd let us know now as opposed to uncorking in the middle in front of the jury just like she did."

After Williams responded that she did not "have any other questions for this witness," the following exchanged occurred:

"MR. ENGLE:  For this witness. I mean—I'm sorry.

"THE COURT:  Well—

"MR. ENGLE:  I'm sorry, Judge. I'm—

"THE COURT:  I understand.

"MR. ENGLE:  I'm trying to hold my cool, but—

"THE COURT:  I understand. Ms. Williams, if you intend to elicit any testimony from any additional witnesses, this witness or any others—

"MS. WILLIAMS:  Mm-hmm.

"THE COURT:  —that even approach the matters that we've addressed in pretrial motions, I'd ask you to alert the Court first before—

"MS. WILLIAMS:  Okay.

"MR. ENGLE:  —asking them questions."

Second, Williams failed to adduce any evidence from which a reasonable jury could find that defendant possessed the firearms that had been seized during the search of defendant's residence and introduced as evidence at trial for the purpose of using them in connection with a controlled substance offense as required by ORS 475.900(1)(b)(C), one of the commercial drug offense factors. Following the state's case-in-chief, defendant moved for a judgment of acquittal

on that ground as well as others. In response, the court allowed Williams to withdraw the allegation pertaining to that commercial drug offense factor. Williams explained:

> "Judge, quite frankly I had planned to make the argument to the jury that weapons are used as a means of protection in drug sale enterprises and their surroundings and I quite simply forgot to ask the officer to elaborate on it.

> "I—when we were going through it I realized that I had forgotten to elicit that testimony. It's my fault. I did feel that there was a basis to support the allegation. So I stipulated to it being withdrawn."

Defense counsel acknowledged the court's ruling, but explained that defendant had been prejudiced because "there's two firearms * * * in evidence and displayed in front of the jury." For that reason, counsel moved for a mistrial or, in the alternative, to remove the firearms from evidence. The state then sought to reopen its case to cure its prior omission concerning the firearms.

The trial court denied the state's motion to reopen its case and defendant's motion for a mistrial, noting that the court was "satisfied from Ms. Williams['s] explanation that the State did not offer the guns into evidence and show them to the jury with any nefarious intent for any purpose of improperly prejudicing the jury." However, the court agreed with defendant that "the weapons that were previously received should be withdrawn and removed from evidence and not shown in front of the jury." When the jury returned to the courtroom, the court gave the following instruction:

> "At the beginning of the case[,] when I read the charges to you[,] you heard me read the following allegation. The allegation was that the defendant was in possession of a firearm * * * for the purpose of using it in connection with the controlled substance offense.

> "That allegation has been withdrawn from this case. You're not to consider that allegation any further. And also in connection with that allegation the Exhibits 25 and 26, which were identified as two firearms[,] have been withdrawn.

> "Those exhibits will not be considered—should not be considered by you as well as Exhibits 14 and 16, two

photographs that included—may or may not have included what appeared to be a firearm, have been withdrawn.

"So all of those exhibits and that allegation should not be considered by the jury any further and I instruct you to ignore that allegation and ignore those exhibits."

Finally, during closing argument, Williams commented on defendant's right to counsel:

"[Defendant] when he was first arrested before he had time to hire a lawyer, talk to a lawyer, think about what statements might benefit him in trial—"

As a result of that statement, defendant's attorney moved for a mistrial, contending that Williams was "blatantly" engaging in conduct "and then each time shrugging her shoulders, and, you know, saying that she didn't know any better" and that he did not know how the course of repeated conduct could be considered as "anything but intentional." In response, Williams asked the court to deny defendant's motion and offer a limiting instruction instead, explaining:

"I meant that comment. It was a careless comment. I should not have said it. I meant it as a timeline reference to when [defendant] made the statements that he made. I have not relied on it in my arguments. It has not become an essential part of the State's case."

The trial court granted defendant's motion for a mistrial. The court explained:

"I accept at face value Ms. Williams['s] statement that was not intentional. I also agree with Ms. Williams['s] comment that the statement alone * * * in the overall context of this case may not standing alone be sufficient to grant a mistrial.

"However, there comes a point and we may have crossed that point where the cumulative effect of a number of missteps along the way when added on to the—the failure to acknowledge the significance of approaching Oren Maney in a way that at least suggested to him that he should not come to court.

"The statement that was made to Mr. Maney was that he should not come to court and lie. There was no suggestion that he should come to court and tell the truth.

"When you tell a witness don't come to court and lie that[] suggests to the witness that he not come to court at all, and, in fact, Mr. Maney is not here.

"The concerns of due process as described in *State v. Huffman*, 65 Or App 594[, 672 P2d 1351 (1983)], apply to a witness that the defense intends to call and has served with a subpoena.

"I denied the defense motion to dismiss this case at the outset on the grounds of prosecutorial misconduct because I concluded at that juncture that there was not a sufficient showing to justify that remedy.

"At this juncture when combined with all of the other statements and the other actions that occurred in this case culminating * * * in the statement * * * that led into the district attorney's closing argument in this case I'm not satisfied that the trial that was conducted in this case comports with the requirements of due process when all of those circumstances are taken into account.

"I'm not sure the State realizes that * * * when a district attorney approaches a witness and suggests that the witness should not come to court and lie contains an implicit suggestion to the witness that the witness not come to court at all.

"But it certainly does in my mind and that's concerning to this Court and while it standing alone may not justify dismissal of the action it certainly is a concern as to the due process, whether the due process requirements have been satisfied for this trial.

"Combined with * * * showing the jury firearms that ultimately did not become part of the State's case combined with the several missteps by the prosecution's office in this case is very troubling to me and I'm concluding that all of those circumstances have combined to result in a trial that[] * * * does not comport with the requirements of due process. So I'm going to grant the defense motion for mistrial."

In conclusion, the court noted that "this trial would [have been] much more fair if Oren Maney [had come] and testified under oath" and explained "what he had to say good or bad." The court further commented that, to the extent that defendant pursued a second motion to dismiss, it "may

be a moot point if the State is able to secure the testimony of Mr. Maney. And assuming that some of the other due process concerns that have occurred during the course of this trial don't occur in the retrial ***."

## C. *Post-Mistrial Prosecutorial Conduct and Motion to Dismiss*

Thereafter, defendant moved to dismiss the charges against him. Before the hearing on that motion, Maney was compelled to testify before a grand jury and given immunity.[8] Maney's grand jury testimony was different from his prior statements in several respects. Most significantly, Maney testified that he never resided with defendant and that the marijuana found in defendant's residence was not his. Maney explained that defendant had asked him whether the marijuana might be his and that he thought that it might have been because he had misplaced a backpack containing marijuana. After Maney had spoken with Law and Burke, he found his backpack and told Engle that his earlier statement that the marijuana was his was incorrect.

At the subsequent hearing concerning defendant's post-mistrial motion to dismiss, defense counsel alerted the court to Maney's grand jury appearance and the general nature of his testimony.[9] Defendant contended that the charges against him should be dismissed because of prosecutorial misconduct, relying on both double jeopardy and compulsory process principles. Defendant contended that double jeopardy principles precluded a retrial because the state would be allowed "to take another run at it" with Maney, whose testimony is now "by their own doing completely

---

[8] According to McDonnell, who testified at defendant's second trial, the state convened the grand jury to investigate whether "someone had solicited Mr. Maney to give false testimony" and subpoenaed Maney to appear as a witness because they wanted "his testimony under oath." When Maney appeared but requested an attorney, the grand jury proceedings were continued. Eventually, McDonnell "walked" Maney to Multnomah Public Defenders and asked one of the senior attorneys if he would represent Maney "as a courtesy." According to McDonnell, an attorney with that office advised Maney to voluntarily testify; however, he refused to do so and was eventually compelled to testify and given transactional immunity.

[9] At the time, Engle stated, "[I]t doesn't appear that the grand jury *** was investigating a crime, but was rather just trying to depose a witness in some fashion."

changed and modified." Further, relying on Williams's conduct before and during trial as well as the state's decision to compel Maney's testimony before the grand jury, defendant contended that the charges against him should be dismissed "because of the extraordinary nature of what was done here." Specifically, Engle stated:

"[H]ere a prosecutor keeps doing these same things over and over again. You know, she keeps saying—she's pleading ignorance every time. And then when you look at it and you listen to it, you know, it's got more and more along the lines of—malicious intent.

"* * * * *

"Even if the Court's not going to find that that was intentional, I'm saying that if somebody's standing here, if some professional, some defendant, somebody before the Court expressed that much ignorance as to what's going on around them I don't think a Court would have any problem finding a willful violation.

"* * * * *

"But each step down the line, * * * each rung in the ladder of—you know, edges you more towards willfulness and we're certainly over the line of bad faith. If somebody trained in the law with the three years' experience [that] Ms. Williams has, you know, damages the trial to that extent, you know, it rises to the level of bad faith and * * * causes the need for a mistrial.

"Just in looking at this, this case at this point particularly to my eyes * * * by the way that Oren Maney has been manipulated, threatened, the actions towards him, the more recent actions * * * where they turn around and give him the carrot * * * of immunity is so damaged beyond repair.

"* * * * *

"* * * [A]nd that being the case with the level of damage * * * done in this trial, you know, there's nothing left to do for it, but to end it, and to end it in [defendant's] favor."

The trial court denied defendant's motion, noting that its gravamen was defendant's contention that there had been "a pattern of misconduct and actions taken by the District Attorney's Office that amount[ed] to essentially

intentional or willful misconduct by the District Attorney's Office" based on "all of the actions that ultimately le[d] [the court] to grant a mistrial in the first instance." The trial court rejected that contention:

> "The conduct that's at issue here I recall very clearly from the trial in the first case. * * * [B]ased on my observations of Ms. Williams['s] conduct in the first case the evidence presented at trial—at the first trial—* * * there was a sufficient series of events in that trial, which I related when I granted the motion for mistrial that I was satisfied that a mistrial was warranted at the time of the first trial.
>
> *"I don't believe, however, and I don't find that those— that series of events, the actions taken by Ms. Williams was intended to cause a mistrial, was taken with indifference to whether a mistrial would be granted, [or] was intended to hamper the defense's ability to present its case. I don't find that any of that occurred.*
>
> "I saw a district attorney who made some mistakes and took some actions that she should not have taken, *but I didn't find that any of * * * those actions were taken intentionally or with any willful purpose to hamper * * * the defense's ability to present its case or to delay this trial.*
>
> "So under those circumstances based on those findings, and it is based not only on the written materials, but on my observation of Ms. Williams['s] conduct at the first trial. I don't believe that dismissal is warranted, so I'm going to deny the defendant's motion to dismiss in its entirety."

(Emphasis added.)

Thereafter, relying on the United States Supreme Court's decision in *Oregon v. Kennedy*, 456 US 667, 102 S Ct 2083, 72 L Ed 2d 416 (1982) (*Oregon v. Kennedy*), and our decision on remand from that court, *State v. Kennedy*, 61 Or App 469, 657 P2d 717, *aff'd*, 295 Or 260, 666 P2d 1316 (1983), defendant filed a supplemental motion to dismiss on double jeopardy grounds. Defendant contended that those cases preclude a retrial where the state engages in misconduct "'intended to interfere with the defendant's right to a fair trial, either by provoking a mistrial or by influencing the jury'" or where prosecutorial misconduct—whether inadvertent or intentional—is sufficiently prejudicial. (Quoting *Kennedy*, 61 Or App at 473.)

The trial court denied that motion, noting again that Williams's conduct before and during the first trial was not intended to cause a mistrial or deprive defendant of his right to a fair trial. The court reiterated:

> "But, again, though, *I conclude that Ms. Williams was not intending to deprive the defendant of a right to a fair trial.* I think she was *** her contact with Mr. Maney prior to trial was intended to ensure that Mr. Maney testified truthfully at trial and did not testify untruthfully at trial.

> "However, I was troubled by the words used and the fact that even though the prosecutor's intent wasn't to deprive defendant of a fair trial, the words that were used *** in that context could reasonably be interpreted by Mr. Maney to be an effort to influence him to not appear at trial, which is troubling."

(Emphasis added.)

D.  *Defendant's Second Trial*

Having determined that there was no impediment to a retrial, defendant's second trial began. When Maney failed to appear after being subpoenaed by the state, defendant obtained a material witness warrant and had him arrested. Maney ultimately testified. He could not recall or remember many aspects of his prior interactions with the prosecution or his prior statements. However, with regard to his interaction with Williams and Boek, Maney testified, "I think I told them to stop harassing me, I think it was, and I closed the door." Consistently with his testimony before the grand jury, he explained any misunderstandings as the product of his misplaced backpack.

The jury convicted defendant of possession and delivery of marijuana. However, the jury did not find that the delivery was accompanied by the requisite number of commercial drug offense factors. Defendant appeals from the resulting judgment.

## III.  ANALYSIS

On appeal, defendant assigns error to the trial court's denial of his post-mistrial motion to dismiss on the ground that prosecutorial misconduct before and during his

first trial violated his constitutional right to compulsory process under Article I, section 11, and the Sixth Amendment.[10] Defendant also assigns error to the trial court's denial of his motion to dismiss on double jeopardy grounds under Article I, section 12, and the Fifth Amendment.[11] Because it will inform our analysis concerning the court's denial of his motion to dismiss on compulsory process grounds, we begin with defendant's contentions pertaining to the court's denial of his motion on double jeopardy grounds.

## A.  *Double Jeopardy*

Specifically, defendant contends that the trial court erred in rejecting his double-jeopardy contentions under Article I, section 12, because "the record in no way supports a conclusion that the prosecutor did not at least *know* that the conduct caused defendant severe prejudice and was indifferent to that result." (Emphasis in original.) Further, defendant contends that the trial court erred in rejecting his Fifth Amendment contentions because there is no evidence to support the trial court's finding of lack of prosecutorial intent. Alternatively, relying on *Oregon v. Kennedy* and the Oregon Supreme Court's subsequent decision in *State v. Kennedy*, 295 Or 260, 666 P2d 1316 (1983) (*State v. Kennedy*), defendant posits that the trial court should have granted his motion to dismiss on double jeopardy grounds under both the state and federal constitutions because, "[r]egardless of the prosecutor's culpability or lack thereof, the prejudice to defendant's case was so severe, that retrial could not have cured it."

As the state correctly notes, we described the principles governing the resolution of a motion to dismiss on double jeopardy grounds under the state and federal constitutions

---

[10] Article I, section 11, provides, in part, that, "[i]n all criminal prosecutions, the accused shall have the right * * * to have compulsory process for obtaining witnesses in his favor[.]" Similarly, the Sixth Amendment provides, in part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor[.]"

[11] Article I, section 12, provides that "[n]o person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself." The Fifth Amendment provides, in part, that "[n]o person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb[.]"

in *State v. Kimsey*, 182 Or App 193, 47 P3d 916 (2002). In *Kimsey*, we explained that

> "[t]he double jeopardy protection embodied in Article I, section 12, *** is, in principle, the same as that embodied in the Fifth Amendment ***. *See generally, State v. Kennedy*, 295 Or [at] 272-76 *** (concluding that the objective to be served by the two clauses is the same, even if the analyses adopted by Oregon and federal courts differ)."

182 Or App at 202-03. That protection "is designed to spare a criminal defendant the embarrassment, expense, and harassment of being subjected to successive prosecutions for the same offense." *Id.* at 203; *see generally State v. Rathbun*, 287 Or 421, 430, 600 P2d 392 (1979).

However, as with other constitutional interests, a defendant can waive double jeopardy protections. "Thus, when a defendant moves for a mistrial or otherwise consents to have a trial terminated, a subsequent trial on the same charges ordinarily is not barred." *Kimsey*, 182 Or App at 203. An exception to that general rule exists "when a mistrial results from prosecutorial or judicial misconduct." *Id.* As we explained in *Kimsey*,

> "[s]uch misconduct will, in a narrow range of circumstances, give rise to a double jeopardy bar on the theory that the official misconduct put the defendant 'to the "Hobson's choice" of either moving for a mistrial or continuing with a jury which was, arguably, favorably disposed to the defendant but is now contaminated by the misconduct.' *Rathbun*, 287 Or at 431; *see also Oregon v. Kennedy*, 456 US at 672-73. Where the state and federal constitutional double jeopardy protections differ is the analyses that the courts have adopted for determining what kinds of official misconduct are sufficiently egregious to trigger a bar to retrial of the charges.
>
> "Under Article I, section 12, the state may not again prosecute a defendant on the same charges if the misconduct that prompted the defendant's successful mistrial motion 'is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal.' *State v. Kennedy*, 295 Or at 276. Thus, prejudice

sufficient to warrant a mistrial is not enough, in and of itself. *State v. Pratt*, 316 Or 561, 579-80, 853 P2d 827[, *cert den*, 510 US 969] (1993). The official also must have acted with *knowledge* of the improper and prejudicial nature of the conduct and with at least *indifference* to the resulting mistrial. *Id.* In other words, the standard requires 'some conscious choice of prejudicial action before the [double jeopardy] guarantee bars correction of the error by a new trial. Negligent error, "gross" or otherwise, is not enough.' *State v. Kennedy*, 295 Or at 273 (footnote and some internal quotation marks omitted). *See also State v. Curl*, 65 Or App 227, 670 P2d 1058 (1983) (even gross negligence on part of prosecutor does not create a double jeopardy problem).

"Under the Fifth Amendment, the test for barring a retrial is even more rigorous. Although it too focuses on the official's mental state in engaging in the misconduct, neither the official's knowledge that the conduct is improper and prejudicial nor indifference to the resulting mistrial will suffice. Rather, the official must actually *intend* the mistrial in the sense that the conduct in question is 'intended to "goad" the defendant into moving for a mistrial.' *Oregon v. Kennedy*, 456 US at 676."

182 Or App at 203-04 (emphasis and third brackets in *Kimsey*).

In sum, notwithstanding defendant's suggestions to the contrary, in determining whether the state and federal constitutional double jeopardy provisions preclude a retrial, the dispositive issue is whether the prosecutor had the requisite *scienter*. For purposes of the state constitution, the trial court must determine whether "the prosecutor either intended or was indifferent to the resulting mistrial or reversal." *Garner*, 234 Or App at 491. For purposes of the federal constitution, the inquiry is more limited—*viz.*, "the official must actually *intend* the mistrial in the sense that the conduct in question is intended to goad the defendant into moving for a mistrial." *Kimsey*, 182 Or App at 204 (internal quotation marks omitted; emphasis in original).

Here, the trial court found that the prosecutor, Williams, did not intend to cause a mistrial and was not indifferent to that result. Thus, the dispositive issue in this case is whether there is evidence to support that finding.

Further—and critically here—the trial court's findings concerning the prosecutor's intent "are binding on review as long as there is evidence in the record to support them." *Id.* at 204. For the reasons that follow, we conclude that there was.

A factfinder will "ordinarily infer intent from circumstantial evidence." *State v. Hennagir*, 246 Or App 456, 462, 266 P3d 128 (2011), *rev den*, 352 Or 33 (2012). "An inference concerning [an individual's] subjective intent is reasonable if there is a logical connection between the surrounding activity and the [individual's] state of mind." *State v. Branch*, 208 Or App 286, 289, 144 P3d 1010 (2006). An "inference need not inevitably follow from the established facts; rather, if the established facts support multiple reasonable inferences, the jury may decide which inference to draw." *State v. Miller*, 196 Or App 354, 358, 103 P3d 112 (2004), *rev den*, 338 Or 488 (2005). Further, and significantly, where "credibility based on demeanor is a crucial factor in making an appraisal of the evidence," we will normally "defer to a trial court's findings of credibility." *State v. Russum*, 265 Or App 103, 120, 333 P3d 1191, *rev den*, 356 Or 575 (2014).

Here, the court found that Williams, a prosecutor whom defendant described as having only "three years' experience," made a series of "mistakes" that resulted in a mistrial. As recounted above, those mistakes included (1) the "words used" in communicating with Maney before trial, 269 Or App at 609-10, 614; (2) the attempt to elicit testimony in violation of the court's prior rulings, 269 Or App at 606; (3) the failure to connect the firearms evidence to the commercial drug offense factor alleged in the indictment, 269 Or App at 607; and (4) the comment on defendant's right to counsel in closing argument, 269 Or App at 609.

However, the court expressly found that the prosecution had not acted with the requisite intent. *See* 269 Or App at 613, 614. The trial court based that finding concerning Williams's *scienter* "not only on the written materials, but on my observation of Ms. Williams['s] conduct at the first trial," noting that it "recall[ed]" that conduct "very clearly." In other words, in assessing the circumstances, the trial court made an explicit demeanor-based credibility

determination in light of its observations of Williams's conduct, which would have included, among other things, her tone of voice, facial expressions, and reactions to objections and court instruction. Accordingly, because Williams's demeanor was a crucial factor in the trial court's assessment of the evidence, we defer to its credibility determination.

Given that, and in light of the nature of Williams's "mistakes" and her relative inexperience, we conclude that the record is sufficient to support the court's finding that Williams did not intend to cause a mistrial and was not indifferent to that result. Thus, the trial court did not err in denying defendant's motion to dismiss on double jeopardy grounds under either the state or federal constitutions. Accordingly, we turn to defendant's assignment of error concerning the trial court's denial of his post-mistrial motion to dismiss on the ground that the state violated defendant's compulsory process rights under Article I, section 11, and the Sixth Amendment.[12]

## B. *Compulsory Process*

Defendant asserts that, "where the state has acted improperly and the result is the effective loss of a defense witness, the violation of defendant's right to a fair trial is the same, *regardless of the prosecutor's intent*."[13] (Emphasis added.) For that reason, defendant posits that, in this case, "intentional or not, the state's repeated contacts irreversibly deprived defendant of the witness and permanently harmed defendant's ability to present his defense." However—and notwithstanding that ostensible premise that the prosecutor's intent was immaterial, given the purported effect of her conduct—defendant ultimately and completely reverses course and contends that the trial court "should have allowed the * * * motion to dismiss as a matter of due

---

[12] As noted above, 269 Or App at 601 n 2, we have rejected without discussion defendant's contentions pertaining to his pretrial motion to dismiss. However, we note that defendant's post-mistrial motion to dismiss on compulsory process grounds encompassed the prosecutorial conduct at issue in the pretrial motion.

[13] For purposes of our analysis, we will assume, without deciding, the correctness of that assertion. *See U.S. v. Bohn*, 622 F3d 1129, 1138 (9th Cir 2010) ("A criminal defendant's constitutional rights may be violated when witnesses are made unavailable through the suggestion, procurement, or negligence of the government." (Internal quotation marks omitted.)).

process" because *"the evidence demonstrates an utter lack of support for the trial court's finding that the state's conduct was not intentionally done to interfere with defendant's ability to present a defense."*[14] (Emphasis added.)

Defendant's contentions are unavailing in this case. Two salient observations demonstrate why that is so.

*First,* the premise underlying defendant's argument is that the state's conduct in this case was "improper." As described above, 269 Or App at 611, defendant's position before the trial court concerning the post-mistrial motion was that the state's conduct was "improper" in this case *because* it was *intentional*—that is, the state intended to hamper defendant's ability to present his case. As the trial court explained, the gravamen of defendant's motion was his contention that there had been "a pattern of misconduct and actions taken by the District Attorney's Office that amount[ed] to essentially intentional or willful misconduct by the District Attorney's Office." *See* 269 Or App at 612-13. Thus, because defendant's compulsory process argument depends on characterizing the state's conduct as "intentional," our inquiry again cycles back to whether there is evidence to support the trial court's finding that the state lacked the requisite intent—that is, that the prosecutor did not intend to hamper defendant's ability to present his case, *see* 269 Or App at 612-13. Given that we have already concluded that evidence supports the trial court's finding,

---

[14] We have explained that "[t]he right to compulsory process under Article I, section 11, * * * parallels federal Sixth Amendment jurisprudence * * * and the analysis of the two is the same." *State v. West,* 250 Or App 196, 203, 279 P3d 354 (2012). Further, the United States Supreme Court has "borrowed much of [its] reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment[.]" *United States v. Valenzuela-Bernal,* 458 US 858, 872, 102 S Ct 3440, 73 L Ed 2d 1193 (1982). For that reason, attempting to draw fine distinctions between the Sixth Amendment Compulsory Process Clause and the Fifth Amendment Due Process Clause case law is unnecessary. *U.S. v. Juan,* 704 F3d 1137, 1141 n 1 (9th Cir 2013) ("[W]e do not unduly concern ourselves with drawing fine distinctions between cases interpreting the Sixth Amendment Compulsory Process Clause and those interpreting the Fifth Amendment Due Process Clause."). In light of that context, we understand that defendant's due process arguments derive from his claimed violation of compulsory process principles and "the analysis is the same." *Huffman,* 65 Or App at 599 ("Defendant's due process argument derives from a claimed violation of the Compulsory Process Clauses and the analysis is the same.").

269 Or App at 618-19, the trial court did not err in denying defendant's post-mistrial motion to dismiss on compulsory process grounds.

*Second,* had defendant asked the trial court to determine whether his compulsory process rights had been violated because, regardless of prosecutorial *scienter,* the prosecutor's conduct was otherwise improper because it effectively deprived him of a witness and permanently harmed his ability to present his defense, the court would have had to engage in a variety of other fact-intensive inquiries. Those inquiries include the following: (1) Did the prosecutor engage in qualifying "misconduct"?[15] (2) Did the "misconduct" have some effect on the witness's testimony?[16] (3) If a prosecutor substantially interfered with a defendant's rights, was that interference harmless?[17] Because of the manner in which defendant framed his compulsory

---

[15] *See, e.g., Juan,* 704 F3d at 1141 ("Although a defendant's right to present a defense is not absolute, the [United States] Supreme Court has recognized [in *Webb v. Texas,* 409 US 95, 93 S Ct 351, 34 L Ed 2d 330 (1972),] that the government may not substantially interfere with the testimony of defense witnesses."); *U.S. v. Vavages,* 151 F3d 1185, 1188 (9th Cir 1998) ("A defendant alleging such interference is required to demonstrate misconduct by a preponderance of the evidence."); *id.* at 1189-90 (explaining that, in the context of perjury warnings, "[a] defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness'[s] decision whether to testify" and that, "[a]mong the factors courts consider in determining the coercive impact of perjury warnings are the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness might lie").

[16] *See, e.g., Huffman,* 65 Or App at 602 ("[I]n order to establish a violation of the Compulsory Process or Due Process Clauses[,] a defendant must show some effect on the witness'[s] testimony, at least when government conduct alleged to have interfered with the defendant's ability freely to present witnesses in his favor is not outrageous.").

[17] *See U.S. v. Bianchi,* 594 F Supp 2d 532, 540 (ED Pa 2009) (explaining that, following *Webb,* several circuits had "adopt[ed] a *per se* rule that did not take materiality, prejudice, or bad faith into consideration" based on the proposition that, where the government prevents a defense witness from freely testifying, the error is not harmless; noting that the United States Supreme Court has held that "the harmless error standard applies to nearly every case involving alleged constitutional violations" and that most circuits "that originally adopted a *per se* rule, incorporated materiality and bad faith into the standard in light of Supreme Court decisions after *Webb*"); *see also Valenzuela -Bernal,* 458 US at 867 ("[R]espondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.").

process challenge, the trial court had no occasion to consider and determine those matters. Thus, the trial court did not err in denying defendant's motion to dismiss on compulsory process grounds.

## IV.   CONCLUSION

In sum, the trial court did not err in denying defendant's motion to dismiss on double jeopardy grounds under Article I, section 12, and the Fifth Amendment and on the ground that prosecutorial misconduct violated his constitutional right to compulsory process under Article I, section 11, and the Sixth Amendment. Accordingly, we affirm.

Affirmed.