Argued and submitted April 24, 2018, reversed and remanded
December 4, 2019; petition for review denied March 26, 2020 (366 Or 259)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AUSTIN CALLAHAN BRAND,
aka Austin Brand,
*Defendant-Appellant.*

Multnomah County Circuit Court
14CR28021; A162224

455 P3d 960

Defendant appeals a judgment of conviction for first-degree kidnapping, coercion, fourth-degree assault, menacing, and recklessly endangering another person. He argues that the trial court erred when it allowed a detective to testify that the alleged victim delayed reporting defendant's conduct to authorities due to her fear of further assaults by defendant, because it amounted to impermissible vouching. Defendant further argues that the error was not harmless. *Held*: The trial court erred by allowing the testimony. The detective's explanation for the alleged victim's delayed reporting constituted impermissible vouching. Additionally, the error was not harmless.

Reversed and remanded.

John A. Wittmayer, Judge.

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. Also on the opening brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Austin Callahan Brand filed the supplemental and reply briefs *pro se*.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

DEHOOG, P. J.

Reversed and remanded.

––––––––––––––
\* DeVore, P. J., *vice* Hadlock, J. pro tempore.

**DEHOOG, P. J.**

Defendant appeals a judgment of conviction for first-degree kidnapping, coercion, fourth-degree assault, menacing, and recklessly endangering another person.[1] In his first assignment of error, defendant argues that the trial court erroneously admitted impermissible vouching testimony when it allowed a detective to testify that the alleged victim's delay in reporting defendant's conduct to authorities was due to her fear of further assaults by defendant. The state's initial response is that defendant failed to preserve that argument. Specifically, the state contends that defendant's only objection at trial was to the detective's testimony regarding delayed reporting in general—which we previously have held to be admissible—and not to any other part of the detective's testimony, including his statement that the victim in this case had delayed making a report because of her fear of further assaults. The state further argues that, even if that issue is preserved, the court did not err when it admitted the challenged testimony, because, contrary to defendant's argument, it was not impermissible vouching. For the reasons that follow, we conclude that defendant preserved the issue he raises in his first assignment of error; we further conclude that the court erred in admitting the detective's explanation of the victim's delayed reporting, because that testimony constituted impermissible vouching. Because that error was not harmless, we reverse and remand.[2]

---

[1] Defendant was charged with first-degree rape (Count 1), ORS 163.375; four counts of first-degree kidnapping (Counts 2 through 5), ORS 163.235; two counts of coercion (Counts 6 and 7), ORS 163.275; attempted first-degree burglary (Count 8), ORS 164.225 and ORS 161.405; two counts of fourth-degree assault (Counts 9 and 10), ORS 163.160; strangulation (Count 11), ORS 163.187; menacing (Count 12), ORS 163.190; recklessly endangering another person (Count 13), ORS 163.195; and reckless driving (Count 14), ORS 811.140. The case was tried to a jury. The court dismissed Counts 1, 2, and 4 on the state's motion. The jury found defendant guilty on Counts 5, 6, 9, 12, and 13. The jury found defendant not guilty on Counts 3, 7, 8, 10, 11, and 14. Four of the jury's five guilty verdicts were nonunanimous.

[2] In 11 additional assignments of error, defendant contends that the trial court plainly erred in failing to strike, *sua sponte*, three statements from another investigating officer that amounted to impermissible vouching, in failing to give a jury instruction requiring concurrence as to a particular occurrence of the coercion charge, in failing to instruct the jury that first-degree kidnapping required that the alleged victim's confinement had occurred in a place where she would not likely be found, in instructing the jury that it could reach a nonunanimous

The pertinent facts are largely procedural and undisputed. However, to provide context to the parties' legal dispute, we first set out portions of the testimony from defendant's trial. The alleged victim, S, testified that defendant had previously been her boyfriend and that the two of them had shared an intimate relationship. At the time of defendant's alleged offenses, S was a recovering heroin addict engaged in methadone treatment and lived with a friend from that program. According to S, defendant came to see her at the apartment that she shared with that friend. They spoke in defendant's car, where he asked her to move out of her apartment and move in with him so that the two of them could be together again. Preferring to focus on her recovery, S refused defendant's request. Defendant responded by first strangling S, and then driving off with her still in his car. As defendant drove, he threatened to crash the car and kill them both; he eventually did drive into a telephone pole, but neither of them was injured. Defendant then took S to a rural barn and, over the next four days, forced her to have sex with him and told her that he intended to keep her at the barn to ensure her withdrawal from methadone. Despite those stated intentions, defendant drove S to and from various places, including her workplace and a methadone clinic, all the while repeatedly threatening her with harm. S acknowledged that, during the course of the incident, she had been able to speak with family and friends and had told them that everything was fine. S also acknowledged that she had had multiple opportunities to call the police for help or even escape, but that she did not attempt to do either of those things over the course of the four days until she went home from the methadone clinic with her roommate. In fact, it was only her roommate who ultimately called the police, in response to defendant repeatedly kicking and banging on the apartment door, demanding to see S.

Detective Turnage, who took part in the investigation of defendant's alleged conduct and interviewed S

<hr>

verdict, in publishing a verdict form that allowed the jury to reach a nonunanimous verdict, and in accepting four nonunanimous verdicts. Because a new record is likely to be produced on remand, we need not consider his additional assignments of error. Defendant also filed a *pro se* supplemental brief asserting two additional assignments of error. We reject those assignments of error without discussion.

multiple times, also testified at trial. Turnage described
his extensive training and experience investigating domes-
tic violence cases and testified that such cases often involve
what is known as delayed reporting.[3] Shortly thereafter, the
prosecutor asked, "we had a situation here with a delayed
report; is that right?" Defense counsel interjected, stat-
ing, "Judge, I have a matter for the Court." The trial court
directed the jurors to return to the jury room, and defense
counsel argued outside their presence that the state had not
laid a sufficient foundation to permit Turnage's testimony.
Counsel specifically argued that Turnage did not have the
"medical or psychological training to discuss these matters."
Defense counsel also argued that Turnage's anticipated
testimony regarding delayed reporting would involve both
speculation and impermissible vouching.

> "[DEFENDANT]: Judge, beyond speculation, it then
> turns into a form of witness vouching; that it's saying there
> are these acts that you took, and I'm telling the jury, it's
> okay to do that because that means you're still a victim.
> And that's just always an improper line of testimony, to say
> that—you know, basically, he can't say I believe this per-
> son. That's essentially what they're doing. We have these
> acts in front of us. I have this training and experience, and
> I'm telling the jury, through my continuation in this testi-
> mony, that if he doesn't outright say I believe it, he's at least
> implying that by acting on it and accepting it. And he will
> say this is common in the domestic violence arena, which is
> then witness vouching.

> "* * * * *

> "THE COURT:   * * * So what we ought to do is this, we
> bring the jury back in, [the prosecutor can] do whatever
> * * * with [Turnage] on his qualifications, feel free to make
> your objection, and I'll rule on it.

> "[DEFENDANT]:   And then, Judge, if I'm not success-
> ful, I want to make sure that I am—that objection is ongo-
> ing for—

> "THE COURT:   That's—make your record however
> you want to, but I understand your position.

---

[3] We have described "delayed reporting" as a phenomenon in which victims of
either sexual abuse or domestic abuse do not report such abuse immediately for
various reasons. *State v. Althof*, 273 Or App 342, 345, 359 P3d 399 (2015), *rev den*,
358 Or 550 (2016).

"[DEFENDANT]:   If—

"THE COURT:   I don't think you have to object to every, single question.

"[DEFENDANT]:   No, but if they change topics a little bit, I might say, 'I renew the objection.'

"THE COURT:   All right. Do what you think you need to do."

After the jury returned to the courtroom, the prosecutor continued with Turnage's direct examination. In an effort to lay an appropriate foundation, the prosecutor asked Turnage additional questions about his training and experience regarding domestic violence, after which the following exchange occurred:

"[PROSECUTOR]:   Those are all of the foundation questions that I have. \* \* \*

"[DEFENDANT]:   So at this time I would renew my objection—

"THE COURT:   Overruled.

"[DEFENDANT]:   —as we discussed."

The prosecutor next asked Turnage about delayed reporting in general. In response, Turnage explained in some detail what a delayed report is and why delayed reporting is commonly observed in domestic violence cases. Following that general testimony, the prosecutor asked Turnage about S's behavior in particular.

"[PROSECUTOR]:   Okay. [S's] behavior in this case, can you explain her behavior?

"[DEFENDANT]:   Judge, I'm going to renew my objection.

"THE COURT:   Overruled.

"[TURNAGE]:   With respect to what?

"[PROSECUTOR]:   With respect to why she didn't go to police immediately upon having a—having an opportunity to report?

"[TURNAGE]:   Sure. [S], in this case \* \* \* had some opportunity to get away, escape, leave, go, run, call, talk to

the police, do what have you \*\*\*. There were those oppor-
tunities that were afforded to her and she chose not to do
those. *When I spoke to [S] it became clear to me [that] the
reason she chose not to do those was under fear, fear of con-
tinued assaults against herself. \*\*\**"

(Emphasis added.)

We first consider the threshold issue of whether
defendant preserved his first assignment of error. As a gen-
eral rule, we will not consider claims of error that were not
raised in the trial court. *State v. Wyatt*, 331 Or 335, 341, 15
P3d 22 (2000); ORAP 5.45(1). To preserve an issue, "a party
must provide the trial court with an explanation of his or
her objection that is specific enough to ensure that the court
can identify its alleged error with enough clarity to permit
it to consider and correct the error immediately." *Wyatt*, 331
Or at 343.

Here, we disagree with the state's contention that
defendant's objections failed to preserve his argument that
Turnage's testimony constituted impermissible vouching.
The state correctly observes that "[w]hen a party objects to
evidence as a whole and the trial court rules that the evi-
dence is admissible, the reviewing court will affirm the trial
court's ruling when any part of the evidence is admissible."
*State v. Collins*, 256 Or App 332, 347, 300 P3d 238 (2013).
And, as the state also notes, evidence regarding the phenom-
enon of delayed reporting is, as a general matter, admissi-
ble to explain why an alleged victim may have waited some
length of time after an alleged assault to report that conduct
to someone else. *State v. White*, 252 Or App 718, 723, 288 P3d
985 (2012). We reject, however, the state's assertion that,
because defendant erroneously sought to exclude Turnage's
testimony regarding delayed reporting in general, he failed
to preserve his specific argument that the trial court should
have excluded Turnage's specific statement that, in his
view, S delayed reporting out of fear. Although it is true that
defendant initially objected, on foundation and speculation
grounds, to Turnage's delayed reporting testimony as a
whole, defendant further argued that this type of testimony
often leads to impermissible witness vouching. The state did
not respond directly to defendant's vouching argument, and
the trial court overruled defendant's objection. The court

expressly noted that it understood defendant's position. It further indicated that defendant could have a continuing objection and would not have to renew his objection on a question-by-question basis. Nonetheless, defendant specifically renewed his objection when the prosecutor asked Turnage about delayed reporting as it related to S's behavior in this case.

Under those circumstances, we conclude that defendant's vouching argument is preserved for appeal. The primary purposes of the preservation rule are to allow the trial court to consider a contention and correct any error, to allow the opposing party an opportunity to respond to a contention, and to foster a full development of the record. *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008). Here, those underlying policies were served by defendant's multiple and ongoing objections, which informed the trial court of the specific aspects of Turnage's testimony that he found objectionable, and alerted the court that impermissible vouching would likely occur as Turnage continued to testify. *See State v. Parkins*, 346 Or 333, 341, 211 P3d 262 (2009) (stating that preservation turns on whether, "given the particular record of a case, the court concludes that the policies underlying the [preservation] rule have been sufficiently served"). Thus, even though Turnage's testimony regarding the phenomenon of delayed reporting in general was admissible, defendant preserved his specific challenge to those aspects of Turnage's testimony that he contends constituted impermissible vouching.

We turn to the merits of defendant's vouching argument. Defendant argues that the trial court erred by admitting detective Turnage's testimony that S's failure to promptly report defendant's conduct resulted from the phenomenon of delayed reporting commonly observed in domestic violence cases. Specifically, defendant argues that Turnage's statement, that "it became clear to me [that] the reason she chose not to [promptly report defendant to police] was under fear, fear of continued assaults against herself," was impermissible vouching testimony because it "necessarily was based on his assessment of [S's] credibility." In support of that argument, defendant contends that this case is controlled by *State v. McCarthy*, 251 Or App 231, 235-36, 283

P3d 391 (2012), in which we held that it was impermissible vouching for a nurse practitioner to testify that a child sexual abuse victim's delayed disclosure had been the result of "fear." The state responds that the court did not err in allowing the challenged portion of Turnage's testimony, because, unlike the nurse practitioner's testimony in *McCarthy*, Turnage's "application of general delayed reporting principles to the specific facts of this case was not tantamount to stating that the victim was telling the truth." The state further contends that defendant's reliance on *McCarthy* is misplaced in any event because, in the state's view, our opinion in that case is "clearly erroneous."

We review whether a trial court admitted impermissible vouching evidence for legal error. *State v. Criswell*, 282 Or App 146, 156, 386 P3d 58 (2016). "[A] witness, expert or otherwise, may not give an opinion on whether [the witness] believes [that another] witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). Prohibited opinions may be express or implied; thus, the "vouching rule is a judicially created rule of evidence" that "prohibits a witness from making a direct comment, or one that is tantamount to a direct comment, on another witness's credibility." *State v. Black*, 364 Or 579, 585, 437 P3d 1121 (2019); *see id.* at 587 (noting that "testimony that constitutes vouching is categorically inadmissible"). The Supreme Court has acknowledged that

> "it is not always easy to draw the line between an inadmissible statement that is tantamount to a direct comment on the credibility of a witness and an admissible statement that is relevant for a different reason but that tends to show that a witness is telling the truth. That is so, at least in part, because much evidence, especially expert testimony, will tend to show that another witness either is or is not telling the truth."

*Id.* at 586 (internal quotation marks and citations omitted). "Whether proffered testimony constitutes impermissible vouching is measured by whether it conveys one witness's opinion of the truthfulness of another witness, or, instead, provides information that permits the jury to make that determination." *Id.* at 587-88; *see also State v. Remme*, 173 Or App 546, 562, 23 P3d 374 (2001) (to be permissible, the

witness's testimony "must assist, not supplant, the jury's assessment of credibility"); *State v. Milbradt*, 305 Or 621, 629, 756 P2d 620 (1988) ("The assessment of credibility is for the trier of fact[.]"). Therefore, it is not impermissible vouching for an expert to provide testimony that "does no more than provide jurors with useful, nonconclusive information from which *inferences* as to credibility *may* be drawn." *Remme*, 173 Or App at 562 (emphasis in original).

We have held that experts may provide general testimony about the behavior of victims. *See State v. Perry*, 347 Or 110, 112, 218 P3d 95 (2009) (evidence that some children who have been abused may delay disclosing abuse is admissible to disprove a claim that delay in reporting demonstrates that no abuse has occurred). More precisely, as relevant here, "expert testimony regarding the phenomenon of delayed reporting" is admissible "'to help explain why the complainant may have delayed reporting the abuse and to counter a possible inference by the jury that the delay is indicative of fabrication.'" *State v. Sundberg*, 268 Or App 577, 582-83, 342 P3d 1090, *rev den*, 357 Or 325 (2015) (quoting *White*, 252 Or App at 723). Therefore, Turnage's testimony regarding the general phenomenon of delayed reporting was admissible, and defendant does not challenge that aspect of the trial court's ruling. Here, however, the specific issue is whether Turnage's testimony—that "[w]hen [he] spoke to [S] it became clear to [him that] the reason she chose not to do those was under fear, fear of continued assaults against herself"—exceeded its permissible bounds, *i.e.*, to explain what the cause of the delayed report in this case *may* have been and to enable the jurors to decide *for themselves* whether, in fact, S's behavior was due to that phenomenon. For the reasons that follow, we conclude that Turnage's testimony did exceed those bounds.

We agree with defendant that our decision in *McCarthy* is particularly instructive here. In *McCarthy*, the complainant disclosed in the course of a child-abuse assessment that the defendant had sexually abused her years earlier. 251 Or App at 232. The pediatric nurse practitioner who had interviewed the complainant testified at trial. *Id.* The nurse practitioner first testified about delayed disclosures and the effects that various "grooming" behaviors by

would-be abusers can have on children generally. *Id.* at 233. The same witness then testified that the complainant

> "delayed her disclosure because of fear. She was told not to tell because she would tear the family apart, and so she was—entered into the secrecy, that fear. She was afraid she wouldn't be believed because of that as time went on. And so that is an aspect of grooming, yes."

*Id.* We held that testimony to be impermissible vouching because it "invited the jury to defer to the expert's testimony that this particular complainant had been groomed by [the] defendant, out of fear and concern for her family, not to report the crimes." *Id.* at 236.

In our analysis in *McCarthy*, we distinguished the Supreme Court's decision in *Perry*. We noted that, in *Perry*, the court held that evidence that some children who have been abused delay disclosing is admissible in a prosecution for sex crimes when offered to disprove a claim that such delay indicates that the alleged abuse did not occur. *Id. Perry*, however, "did not involve expert testimony that applied general principles related to the phenomenon of delayed reporting in child sex abuse cases to the specifics of the instant case." *Id.* In *McCarthy*, on the other hand, the state's witness did apply the general phenomenon to the specific facts of the case, thereby inviting the jury to defer to her credibility assessment; that is, "she was telling the jury that she believed the complainant's report of abuse and, by extension, that the jury should believe it, too." *Id.*

As noted, the state argues that *McCarthy* is "clearly erroneous" and should not guide our decision here, because that decision is difficult to reconcile with other cases in which we and the Supreme Court "have repeatedly held that expert testimony permissibly may apply general principles like delayed reporting to specific facts of the case."[4]

---

[4] Although the state describes *McCarthy* as "clearly erroneous," it does not suggest that *McCarthy* should be overruled under our rigorous "plainly wrong" standard. *See State v. Civil*, 283 Or App 395, 417, 388 P3d 1185 (2017) ("[D]ue regard for *stare decisis* and our predecessors' collegial commitment demands that 'plainly wrong' be a rigorous standard, satisfied only in exceptional circumstances."). *See also Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011) ("[W]e begin with the assumption that issues considered in our prior cases are correctly decided, and the party seeking to change a precedent must assume

In support of that assertion, the state cites three decisions: *Middleton*, 294 Or at 433; *State v. Swinney*, 269 Or App 548, 559, 345 P3d 509, *rev den*, 357 Or 743 (2015); and *State v. Beauvais*, 357 Or 524, 354 P3d 680 (2015). Having again reviewed those decisions, we conclude that none of them stands for the proposition that the state advances.

In *Middleton*, the Supreme Court permitted expert testimony about the "typical response of a rape victim" and whether the victim's behavior "was *consistent*" with that "typical behavior." 294 Or at 432-33 (emphasis added). Similarly, in *Swinney*, we held that it was permissible for a police detective to testify about "grooming behavior generally and his opinion that defendant's behavior as described by the victim was *consistent* with grooming behavior," because it provided the jury with context for its own evaluation of the victim's testimony without itself commenting on her credibility. 269 Or App at 549, 559 (emphasis added). And, in *Beauvais*, the Supreme Court held that it was permissible for an interviewer to testify that she had asked the child victim whether anyone told her what to say during the interview and that the victim had provided a negative response. 357 Or at 547-48. That, the court reasoned, was because the testimony merely presented a basis for the jury to determine for itself whether the victim had been coached in that manner. *Id*.

Each of the foregoing cases involved testimony that was potentially helpful to the jury in making its own credibility determination, but that did not tell the jury, expressly or implicitly, that the testifying witness believed the victim's account of the defendant's alleged conduct. Unlike the challenged testimony in *McCarthy*, the witness in each of those cases left unconnected the final dot in the picture that the state sought to draw; as a result, it remained up to the jury to make that connection—if it so chose—by assessing the complainant's credibility for itself, rather than simply deferring

responsibility for affirmatively persuading us that we should abandon that precedent." (Internal quotation marks omitted.)). Here the state merely asserts that our decision in *McCarthy* is clearly erroneous and supplies no basis for reversal in this case. Given the absence of any principled argument by the state that we should overrule *McCarthy*, we continue to rely on our decision in that case to the extent it applies here.

to the opinion of the state's witness. By contrast, here, as in *McCarthy*, the challenged statement exceeded the bounds of permissible testimony and crossed over into impermissible vouching because it did more than assist the jury's credibility determination—it supplanted it. Specifically, Turnage's testimony conveyed his conclusion—that the alleged victim delayed reporting defendant's conduct because she feared further assaults by him—which, in turn, signaled to the jury Turnage's belief that S's account of events was truthful. *See Black*, 364 Or at 589 ("Such statements signal the expert's belief that another witness is telling the truth, and they invade the jury's role as the sole arbiter of witness credibility.").

The state contends that there is no meaningful distinction between, on the one hand, testimony from an expert that an alleged victim's behavior is *consistent* with that of a victim of abuse and, on the other hand, testimony directly connecting general principles with which the expert is familiar to the specific facts of a case. The state reasons that "all delayed reporting evidence puts before the jury the factual assumption that the victim did not fabricate her allegations and \*\*\* the jury is unlikely to perceive a significant difference between opinion testimony that 'the victim delayed reporting out of fear of further assaults' and opinion testimony that 'the victim's delay in reporting was consistent with that of a domestic violence victim who delays reporting out of fear of further assaults.'" Although we, like the Supreme Court, recognize that the line between permissible context and impermissible vouching may be a fine one, it nonetheless exists, as the above case law illustrates. The state has provided us with no persuasive reason to deviate from that precedent. Accordingly, we conclude that Turnage's statement that S's delayed reporting of defendant's conduct out of fear constituted impermissible vouching and that, therefore, the trial court erred in admitting that testimony.

We turn to whether the trial court's error in admitting that evidence requires reversal. We may not reverse the trial court's judgment if the error had "little likelihood of affecting the verdict." *State v. Henley*, 363 Or 284, 307, 422 P3d 217 (2018). Defendant argues that the error in

admitting Turnage's statement was not harmless, because the victim's credibility was a central aspect of defendant's case and the trial was extremely close, as evidenced by the numerous acquittals and nonunanimous guilty verdicts. *See* 301 Or App at 60 n 1. The state responds that the error was harmless because Turnage's statement was qualitatively similar to other admitted evidence that defendant does not challenge. We agree with defendant that the error was not harmless.

"In making a determination of harmlessness, the court does not ask whether the evidence of guilt is substantial or compelling, but rather whether the trial court's error was likely to have influenced the verdict." *Henley*, 363 Or at 307. We have observed that, where a trial is essentially a credibility match between the defendant and an alleged victim, "evidence commenting on the credibility of either [is] likely to be harmful." *State v. Lowell*, 249 Or App 364, 370, 277 P3d 588, *rev den*, 352 Or 378 (2012). There is little doubt that S's credibility played an important role in this case. S testified that defendant committed multiple crimes against her over a period of days, during which she had had various opportunities to flee from defendant or otherwise seek help, but chose not to do so. We further note that, where a jury verdict is nonunanimous, evidentiary error is more likely to have been harmful. *See, e.g.*, *State v. Logston*, 270 Or App 296, 307, 347 P3d 352 (2015) (determining that an error is not harmless where credibility was key, defendant made no admission, and the jury was not unanimous). This was a close trial, in that the jury acquitted defendant on multiple charges and found him guilty by a nonunanimous verdict on others.

The state does not dispute that those factors generally would weigh in favor of the conclusion that the trial court's error in allowing Turnage's testimony was not harmless. The state contends, however, that here the error was harmless because the court allowed a different witness—Officer Hardy—to testify, over an objection by defendant, that S's failure to report was typical for a victim of domestic violence, and defendant does not assign error to that ruling on appeal. The state reasons that, because Hardy's testimony was not qualitatively different from Turnage's erroneously

admitted testimony, there is little likelihood that the error harmed defendant.

Hardy testified during the state's case-in-chief that he had responded on the day of defendant's arrest and had participated in the ensuing investigation. Like Turnage, Hardy discussed his training and experience as a police officer dealing with domestic violence cases. The prosecutor asked Hardy to compare S's behavior in this case to the typical behavior of a victim of domestic violence.

"[PROSECUTOR]: *** [I]n your interaction with [S], was her behavior typical of a victim of domestic violence?

"* * * * *

"[HARDY]: It was.

"* * * * *

"[PROSECUTOR]: Okay. And in what way?

"[HARDY]: You're dealing with things like security, children, finances, places to stay, however many years of a relationship, how many times have they said—the offender has said that they're going to get better, not do it again, and for a victim to—of domestic violence, a lot of times, to come out from that, they feel that they're [*sic*] safety net is gone. And they also feel like, in many cases, 'I'm responsible for the actions of the offender.'

"* * * * *

"[PROSECUTOR]: In your experience and training, do victims of domestic violence delay reporting?

"[HARDY]: Yes.

"[PROSECUTOR]: And does that—would you say that happens frequently or infrequently?

"[HARDY]: Frequently.

"* * * * *

"[PROSECUTOR]: Okay. And why does that happen?

"* * * * *

"[HARDY]: For the reasons why I had stated earlier. As there's a break in the relationship, and they realize, 'I can move forward and I don't want to be abused anymore,'

more of the truth of what they have gone through, they build the strength to report it."

As the state points out, the "erroneous admission of evidence that is 'merely cumulative' of other admitted evidence and not 'qualitatively different' than other admitted evidence is generally harmless." *State v. Blaylock*, 267 Or App 455, 472, 341 P3d 758 (2014), *rev den*, 357 Or 299 (2015) (quoting *State v. Davis*, 336 Or 19, 34, 77 P3d 1111 (2003)). Here, however, we disagree with the state's contention that Turnage's testimony was not qualitatively different from Hardy's. Hardy discussed the concerns and thought processes of domestic violence victims generally, and stated that they frequently delay reporting incidents of domestic violence. Hardy also confirmed that the behavior of the alleged victim in this case was "typical" for a victim of domestic violence. We see little if any distinction between Hardy's testimony, here, that S's behavior was "typical" of a domestic violence victim, and the testimony that we have held to be permissible in other cases, that an alleged victim's behavior was "consistent" with that of an actual victim. *See, e.g.*, *Middleton*, 294 Or at 438 (testimony describing the reaction of a typical child victim of familial sexual abuse and showing that the victim reacted in such a typical manner was not impermissible vouching). As in those cases, Hardy's testimony merely provided the jury with information that it might find helpful in making its own credibility determination; unlike Turnage, he did not make that determination for the jury. As a result, Turnage's testimony was qualitatively different from Hardy's and, we conclude, not harmless.

Reversed and remanded.